# CASES DETERMINED

## BY THE

# SUPREME COURT

### OF THE

## STATE OF MISSOURI

#### AT THE

#### APRIL TERM, 1901.

---

### THE STATE v. BIXMAN, Appellant.

#### In Banc, April 15, 1901.

1. **Beer Inspection: TITLE OF ACT: TWO SUBJECTS: CONSTITUTIONAL.** The title of the act was: "An act creating the office of inspector of beer and malt liquors of the State and providing for the inspection of beer and malt liquors manufactured and sold in this State." *Held*, that the title is not unconstitutional as covering two distinct subjects, to-wit, inspection and revenue, for the one clearly expressed subject-matter of the act is the inspection of beer, and the other, to-wit, the exaction of a fee or tax for such inspection, is germane to that purpose. It is not essential to the validity of the act that the title recite the moneys which the body of the act exacts.

2. ——: **AMOUNT OF FEES EXACTED: REVENUE MEASURE.** The fact that a large revenue results to the State from the inspection fees fixed by said act upon the brewers for the privilege of carrying on their business in this State, does not make said act a revenue measure or tax under the guise of an inspection.

3. ——: **SELLING INTOXICANT: POLICE REGULATION: ARBITRARY POWER OF STATE: POPULAR DEMAND.** It has long been the established law of this State that the right to sell spirituous or intoxicating liquors

State v. Bixman.

is not a natural right, but is a calling which no one has the right to pursue without having first received the privilege or a license so to do from the lawful authorities of the State. The State, in the exercise of its police powers, can prohibit the sale of intoxicating liquors altogether, or can permit their sale under such regulations as it deems proper. Nor is such arbitrary legislative power limited to a conviction of the people that such sale is hurtful. Legislative power is limited only by the Constitution, and does not depend upon the approval or disapproval of the people.

4. ———: ———: ———: NOT A REVENUE MEASURE. The right to sell beer being a privilege granted by the State, and the State having authority to prescribe the terms upon which such privilege shall be exercised, a law providing for the inspection of beer, and fixing certain fees as the price for such inspection, and making it unlawful for any person to sell beer until such beer has been inspected and such fees paid, does not transcend the legitimate office of an inspection law simply because it yields a revenue far beyond the cost of inspection. In such case the cost of the inspection has no application, so long as the fee exacted is the price which the State demands for the privilege of doing the business of brewing and selling beer and malt liquors. Such law is not a tax on property, and hence does not violate the constitutional requirements that taxes shall be levied according to value and be uniform.

5. ———: ———: ESTOPPEL ON LEGISLATURE. The classification by the State of brewers as manufacturers and merchants, and the permitting of the manufacture and sale of beer upon the same terms as other commodities are permitted to be manufactured and sold, does not work an estoppel on the Legislature nor does it in anywise forbid it to change the laws governing the manufacture or sale of beer or other malt liquors. The public policy of the State is to be discerned in the laws the representatives of the people enact.

6. ———: OCCUPATION TAX. It is competent for the Legislature to fix the amount of an occupation tax in proportion to the business done or the output sold by the manufacturer. It is not necessary that the license issue for a fixed period, or that a fixed amount be paid for a fixed time.

7. ———: MANUFACTURE OF BEER: EXCLUDING CERTAIN CEREALS: LEGISLATIVE CONCLUSION. The Legislature, in the exercise of its police powers, can prescribe the cereals to be used in the manufacture of

State v. Bixman.

beer, or may prohibit its manufacture altogether. And in the exercise of that power it may exclude any cereal, even wheat or corn, which it deems deleterious to the public health, and if there be a doubt as to the noxious character of the cereal allowed or excluded, the legislative determination of that fact is conclusive on the courts.

8. ———: LICENSE AND TAX. There is no necessary connection between a license and a tax upon the privilege of carrying on a business. One statute may impose a tax upon the privilege and another may confer the privilege of carrying on the business.

9. ———: WATER EXCLUDED FROM MANUFACTURE: LETTER OF LAW. All laws will be given a reasonable construction. Because a law in mentioning the things that may enter into the manufacture of beer did not mention water, it will not be held that the Legislature meant to exclude water. Courts do not stick in the letter of a law, but look for its intention and meaning.

10. ———: DESTRUCTION OF BEER INSPECTED. The beer inspection law may be enforced without a destruction of the beer. It does not require or contemplate the opening of each barrel or bottle after it is closed or sealed. The inspector must be satisfied and be able to certify that the beer comes up to the standard fixed by the statute, but he can make this inspection while the beer is yet in vats, or he can inspect one bottle of his own selection from a case, etc.

11. ———: ARBITRARY CLASSIFICATION. It is no arbitrary classification to impose an inspection upon beer and permit all other intoxicants to be manufactured and sold without such inspection. No intoxicating liquor can be sold except by permission of the State. To manufacture or sell it is not a natural right, but a given privilege, and the privilege may be given on different terms.

12. ———: INTERSTATE COMMERCE. The beer law of this State essays to act upon beer imported from other States only after it has reached its destination, and hence, under the "Wilson Act" of August 8, 1890, it does not violate the right of interstate commerce. Said law does not discriminate against the imported beer.

13. ———: ———: BY WHOM RAISED. Where defendant has been convicted of selling uninspected beer manufactured in this State the question of whether the beer law violates the right of interstate commerce, can not be raised by him.

14. ———: INSPECTION FEES: IMPOSTS: FEDERAL CONSTITUTION. The clause of the Constitution prohibiting a State from laying imposts or duties on imports or exports, refers to imports from foreign

State v. Bixman.

countries, and not from one State to another. Besides, it is for Congress and not the courts to determine that the fees imposed for the inspection of beer imported into this State are excessive. And again, this charge that that section of the Federal Constitution is violated by the excessiveness of the fees this State law imposes on imported beer, can not be raised by one who has been convicted of selling uninspected beer manufactured in this State.

15. ———: FOURTEENTH AMENDMENT: PURPOSE. The fourteenth amendment to the Federal Constitution was never designed to prevent a State from adjusting its system of taxation, or to interfere with the exercise of its exclusive right to make all proper police regulations to promote the health, peace, morals, education or good order of its people, so long as some particular provision of the Constitution is not infringed by the State law. And hence the law of Missouri that imposes a fee for the privilege of manufacturing or selling beer within this State, is not in conflict with that amendment.

16. ———: EXPORTERS AND DOMESTIC DEALERS: INEQUALITY OF BURDENS. It is entirely competent for the Legislature to put exporters in one class in assessing fees for the sale of beer, and domestic dealers in another. The law is not invalid because it imposes an inspection fee on all beer sold within this State but exempts all beer exported from the State from such fees.

PER BURGESS, C. J., DISSENTING.

1. ———: TITLE OF STATUTE. The purpose of a statute must be determined by its natural and reasonable effect. Neither the use of the words "inspection" in the title, nor the language of the act itself, makes a statute an inspection law if its clear purpose is the raising of revenue.

2. ———: PURPOSE OF ACT: REVENUE: INVALID. The State in the exercise of its police power may require the inspection of beer in this State before it is offered for sale, and may allow reasonable fees for the inspection and the expenses thereof. But if the act providing therefor be intended as a means of raising general revenue, or if such is its effect, it can not be sustained, for such fees are only permissible for the purpose of paying the expense of regulating and controlling the business, and are not taxes. And hence a bill providing for the inspection of beer, which requires all the fees collected to be turned into the State Treasury, which yields an annual income forty-five times as great as the cost of inspection and

expenses, is a revenue measure, and can not be upheld as a police regulation whose purpose is the inspection of beer, but must stand or fall as a tax law.

3. ———: INSPECTION LAWS: PURPOSE: FEES ALLOWABLE. Revenue is never the object to be attained by inspection laws, nor is their object the restraint of the sale of the article to be inspected. An inspection law is for the protection of the people from fraud and imposition in certain articles in use, and to promote health and advance morals. And the character of the article inspected—whether its use as a beverage or otherwise be demoralizing or not—is of no significance, in so far as the fee to be charged for the inspection is concerned. Whatever be its character, nothing more than a reasonable fee for the labor and cost attending the inspection can be allowed therefor. Such fees can not be exorbitant. The right to exact inspection fees can not be made a cover for imposing a tax for general revenue.

4. ———: ———: OCCUPATION TAX: INVALID LAW. The "beer bill" can not be sustained as an inspection law. Its manifest purpose makes it a revenue measure. Nor does it impose an occupation tax. It, on the contrary, imposes a property tax, in addition to that already permitted by the Constitution, and it is therefore void. Under the disguise of an inspection fee it imposes a State tax of six per cent on the market value of beer, while the maximum rate permitted by the Constitution (15 cents on the $100) is less than one-sixth of one per cent.

5. ———: TITLE: NOT BROAD AS ACT. The act was entitled, "An Act creating the office of inspector of beer and malt liquors of the State and providing for the inspection of beer and malt liquors manufactured and sold in this State," but the act itself imposed an inspection fee on beer and malt liquors manufactured outside of this State and sold within this State. *Held*, as this last requirement was by implication excluded from the title, the act was invalid. The title conceals the purpose of the bill. The title must be the exclusive index to the legislative intent.

6. ———: ———: LICENSE. And because said title gives no intimation that the inspection fee allowed is intended to be a license tax, said exorbitant fee can not be sustained as the price which the State imposed for the privilege of selling and manufacturing beer in this State.

7. ———: UNIFORMITY OF TAXATION: DIFFERENT TAX FOR EXPORTER AND DOMESTIC DEALER. Said act violates that part of the Constitu-

State v. Bixman.

tion which provides that taxes "shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax," in that it discriminates between the exporter and the domestic dealer by imposing an inspection fee on the brewer who sells his product within this State and entitling the exporter to have his beer inspected free of cost.

8. ———: ———: SPECIFIC TAX. A law that imposes the same tax per gallon on all grades of beer irrespective of their value, is in violation of the constitutional provision requiring uniform taxation.

9. ———: EQUAL PROTECTION OF THE LAW. A law that requires a brewer who sells his beer in this State to have it inspected and to pay an inspection fee therefor, but requires the brewer who ships and sells his brew beyond this State to have his beer inspected but requires that inspection to be free of cost, is violative of that part of the Federal Constitution which prohibits any State from denying to its citizens the equal protection of the laws.

10. ———: INSPECTION: PRACTICAL EFFECT: PACKAGE. Any provision of a statute which declares its meaning or purpose is authoritative. The statute in this case requires the inspection to be made after the beer is put in the package, and defines a package to mean "any vessel of any kind other than pint or quart bottles," and as it conclusively appears from the evidence that the force of inspectors provided for by the act can not inspect, in the way the statute requires, all the beer brewed and sold in this State, without subjecting the business to delays to such an extent as to practically destroy it, and that an attempt to inspect or analyze the beer after it has passed into packages for consumption involves a spoliation of every package thus inspected, said act is void because of a want of proper provisions to carry it into practical effect.

11. ———: PACKAGE: MEANING. An act which requires beer to be inspected while in the package, can not be construed to mean that it may be inspected while in the vats or mash. The word "package" has no such meaning.

Appeal from Henry Circuit Court.—*Hon. W. W. Graves,* Judge.

AFFIRMED.

*G. A. Finkelnburg* for appellant.

(1) The Act of May 4, 1899, is a revenue measure and imposes a tax. The title or phraseology of a statute can not control its ultimate meaning and validity. This must be determined by the courts upon an examination of its true nature and effect. A statute, enacted under all the forms of law, may nevertheless be destructive of some constitutional right or violate some constitutional limitation. "In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect." Henderson v. New York City, 92 U. S. 268; Minnesota v. Barber, 136 U. S. 313; Prentice on Police Powers, p. 31. A bona fide inspection fee is always graduated with some reasonable relation to the cost of the inspection. As its name indicates, it is a fee for the services rendered by the inspector and is paid to him as his compensation and for incidental expenses. Brimmer v. Rebman, 138 U. S. 78; Am. Fertilizer Co. v. Board of Agriculture, 43 Fed. 609; Patapsco Guano Co. v. North Carolina, 171 U. S. 345; Willis v. Standard Oil Co. (Minn.), 52 N. W. Rep. 652; Cooley on Taxation, pp. 90, 603; State ex rel. v. The Judges, 21 Ohio St. 11; Cooley on Constitutional Limitations, 153. (2) The act in controversy imposes a tax upon property. It is hardly admissible at this day to argue that a tax on the sale of an article is not a tax on the article itself. That was settled by the case of Brown v. Maryland, 12 Wheaton, 419. The act here in controversy simply levies a tax on the property which the brewer has manufactured after he has been duly licensed to manufacture it. The question, what is a "property tax," has been before the court on repeated occasions, and the court has always regarded the substance rather than the form of the law imposing the tax. City v. Tooey, 141 Mo. 625; State v. Stephens, 146 Mo. 684; State v. Tracy, 94 Mo. 217; State v. Switzler, 143 Mo. 331; Crow v. State, 14 Mo. 283. In no sense of the word can this tax be called an occupation tax. (3)

The tax imposed is in excess of the constitutional limit. City of Kansas v. Johnson, 78 Mo. 666; State v. Tracy, 94 Mo. 225; State v. Stephens, 146 Mo. 662; City v. Tooey, 141 Mo. 625; Black v. McGonigle, 103 Mo. 202; State v. Town of Columbia, 111 Mo. 365; State v. Railroad, 123 Mo. 78; Arnold v. Hawkins, 95 Mo. 569; Book v. Earl, 87 Mo. 255; Overall v. Ruenzi, 67 Mo. 203; State ex rel. v. Switzler, 143 Mo. 331. (4) The tax imposed by the act is not uniform. Chicago v. Collin, 174 Ill. 445; City v. Arndt (Ala.), 28 So. Rep. 70; State v. Switzler, 143 Mo. 333; Ex Parte Jones (Texas), 43 S. W. Rep. 513; Pullman Car Co. v. State, 64 Texas, 274; City v. Stearns, 2 Pa. Dist. Rep. 351; City of Savannah v. Weed, 84 Ga. 683; Kansas City v. Grush (Mo.), 52 S. W. Rep. 286; State v. Tucker (S. C.), 35 S. E. Rep. 215; State v. Hoyt (Vt.), 42 Atl. Rep. 973; Amoskeag Mfg. Co. v. City (N. H.), 47 Atl. Rep. 74. (5) The tax proposed is not in proportion to value. Redmond v. Commissioners, 106 N. C. 122; City v. Stearns, 2 Pa. Dist. Rep. 351. (6) The title of the act violates the requirements of the Constitution. City of Kansas v. Payne, 71 Mo. 162; State v. Heege, 135 Mo. 112; State v. Jackson County, 102 Mo. 531; State v. Lafayette County, 41 Mo. 39; State v. County Court, 128 Mo. 427, 441; Wittman v. Railroad, 131 Mo. 612; State v. Persinger, 70 Mo. 346. (7) The act violates the right of interstate commerce. Brown v. Maryland, 12 Wheaton, 419; Schollenberger v. Pennsylvania, 171 U. S. 1; Leisy v. Hardin, 135 U. S. 100; Packet Co. v. Keokuk, 95 U. S. 86; State v. Emert, 103 Mo. 241. (8) The act is void for want of proper provisions to carry it into effect. The act is nugatory and void for the same reason that the "Julian Law" was held void in State v. Railroad, 146 Mo. 155, that is, for want of adequate provisions in the act to carry it into practical effect. The reasons for this may be summarized as follows: (a) It conclusively appears that one inspector and four

deputies can not possibly inspect all the beer produced and sold in all the breweries in the State of Missouri without subjecting the business to delays so ruinous as to practically destroy the same.   (b)   It has been shown that it is scientifically as well as practically impossible to ascertain from inspection or analysis of the finished product of what cereal the beer has been brewed, whether barley, corn, wheat or other malt grain.   (c)   It has been shown that an attempt to inspect or analyze the beer after it has passed into its final stage ready for consumption involves a spoliation of every package thus inspected.   (d)   As heretofore explained, beer can not be brewed exclusively of the materials mentioned in section 4 of the act.

. *Kehr & Tittmann* for appellant.

(1)   Courts will, at all times, examine a statute, and, regardless of its recitals, determine its character by its natural and reasonable effect.   City of St. Louis v. Spiegel, 75 Mo. 146; State v. Julow, 129 Mo. 177; Hnderson v. New York, 92 U. S. 268; Austin v. Murray, 16 Pick. 126; Mugler v. Kansas, 123 U. S. 661; Muehlenbrink v. Coms., 42 N. J. L. 364; Burlington v. Ins. Co., 31 Iowa, 102.   (2)   The act contains two subjects, one expressed and the other omitted in the title.   It therefore violates section 28 of article 4 of the Constitution, and is void.   City of Kansas v. Payne, 71 Mo. 162; State v. Burgdoerfer, 107 Mo. 30; St. Louis v. Weitzell, 130 Mo. 616; State ex rel. v. County Court, 102 Mo. 537; State ex rel. v. Lafayette County Court, 41 Mo. 39; State ex rel. v. Heege, 135 Mo. 119; Henderson v. Ins. Co., 34 N. E. 565; Coms. Sedgwick Cty. v. Bailey, 13 Kas. 600; Swayze v. Briton, 17 Kas. 625; Shepherd v. Helman, 23 Kas. 504; Railroad v. Sanders City, 9 Neb. 507; Parish of Bossier v. State, 13 La. Ann. 433; Grosvenor v. Duffy, 80 N. W. 19.   (3)   The necessary effect of the method of inspection provided for by the act, is

to injure or destroy the article inspected.   Any injury to property whereby its use is destroyed or its value lessened is a taking without due process of law and without just compensation.   Matter of Application of Jacobs, 98 N. Y. 105; Constitution, art. 2, secs. 21 and 30; Pumpelly v. Green Bay Co., 13 Wall. 179; Hanson v. Vernon, 27 Iowa, 90.   (4)   Whether the subject of the act is within the scope of the police power of the State is a judicial question.   State v. Fisher, 52 Mo. 177; Tiedeman on Lim. Police Power, pp. 197, 198 and 431; Lake View v. Rose Hill Cem., 70 Ill. 192; Tiedeman on Mun. Corp., p. 208, sec. 122; Lawton v. Steele, 152 U. S. 137; Forster v. Scott, 136 N. Y. 584.   (5)   The act does not relate to or tend to promote the public health, comfort, safety or welfare, and therefore is not within the police power of the State.   State v. Fisher, 52 Mo. 177; Matter of Application of Jacobs, 98 N. Y. 115; State v. Julow, 129 Mo. 177; People v. Marx, 99 N. Y. 387; People v. Gilson, 109 N. Y. 401; Health Dept. v. Rector Trinity Church, 145 N. Y. 42; Colon v. Lisk, 153 N. Y. 196; People ex rel. v. Wardon of Prison, 157 N. Y. 126; People v. Compagnie, G. T. 107 U. S. 63; People v. Crowley, 113 U. S. 710; Mugler v. Kansas, 123 U. S. 661; Minnesota v. Barber, 136 U. S. 319; Brimmer v. Rebman, 138 U. S. 81; State ex rel. v. Judges, 21 Ohio St. 11; Austin v. Murray, 16 Pick. 127.   (6)   To be an inspection fee, the charge must be limited to the necessary or probable expense of the service rendered.   If it exceeds that, it is a tax.   The total cost of inspection is fixed by the act at $12,000 per annum.   The income is $558,000 per annum.   Therefore, it is a tax.   City v. Boatman's Ins. & T. Co., 47 Mo. 152; City v. Spiegel, 75 Mo. 145; Pace v. Burgess, 92 U. S. 372; Wittler v. Standard Oil Co., 50 Minn. 290; Minnesota v. Barber, 136 U.S. 313; Brimmer v. Rebman, 138 U. S. 78; Mays v. Cincinnati, 1 Ohio St. 268; Tiedeman on Municipal Corp., p. 213, sec. 123; St. Paul v. Traeger, 25

State v. Bixman.

Minn. 51; Taylor v. Pine Bluff, 34 Ark. 603; Vansant v. Harlem S. Co., 59 Md. 330; State v. Bean, 91 N. Car. 544; Kansas City v. Grush, 151 Mo. 128. (7) A valid classification for the purposes of taxation must have a just and reasonable basis. State v. Loomis, 115 Mo. 307; State ex rel. v. Miller, 100 Mo. 439; Railroad v. Ellis, 165 U. S. 150; Cooley Const. Lim. (6 Ed.), p. 481; State v. Julow, 129 Mo. 165; Dunne v. Kansas City C. Co., 131 Mo. 1; State v. Grannemann, 132 Mo. 326. (8) The act contravenes the fourteenth amendment to the Constitution of the United States. Virginia v. Rives, 100 U. S. 313; Ex Parte Virginia, 100 U. S. 339; United States v. Cruikshank, 92 U. S. 542; Slaughter House cases, 16 Wall. 36; Railroad Tax cases, 13 Fed. Rep. 722. (9) The act contravenes the second clause of section 10, article 1, of the Constitution of the United States. Brown v. Maryland, 12 Wheat. 419; Almy v. California, 24 How. 169; Packet Co. v. Keokuk, 95 U. S. 86; Leisy v. Harding, 135 U. S. 100; State v. Shapleigh, 27 Mo. 344; State v. North, 27 Mo. 464; Crow v. State, 14 Mo. 237; State v. Emert, 103 Mo. 241.

*Koehler & Reiss* also for appellant.

(1) The trial court erred in refusing to admit evidence of the fact that corn and cereals other than those designated in the Act of May 4, 1899, are wholesome and not deleterious and have been used in the manufacture of beer for many years. People v. Marx, 99 N. Y. 387; Waterbury v. Newton, 50 N. J. L. 544. (2) The court erred in refusing to admit evidence to show that there is a species of malt liquor (weiss beer) that is and can only be made of wheat. People v. Marx, 99 N. Y. 387; Waterbury v. Newton, 50 N. J. L. 544. (3) The court erred in admitting evidence as to the possibility of de-

termining from an inspection and analysis of the "mash" what cereals are included in the same. The act provides for an inspection of the finished product when ready for market—not for an inspection of the "mash" in the various stages of preparation. R. S. 1899, sec. 7688. (4) The mere fact that an act purports to be an inspection measure, is not conclusive upon the court. Its purposes and objects must be determined by its natural and reasonable effect. The court is not to be misled by mere pretenses. Parker & Washington on P. H. & S., sec. 5, p. 6; Mugler v. Kansas, 123 U. S. 661; Mayor etc. v. Railroad, 32 N. Y. 261; Railroad v. Hoboken, 41 N. J. L. 71; Henderson v. Mayor of N. Y., 92 U. S. 268; People v. Compagnie, G. T., 107 U. S. 63; Soon Hing v. Crowley, 113 U. S. 710; Brimmer v. Rebman, 138 U. S. 81; Minnesota v. Barber, 136 U. S. 319; Railroad v. Husen, 95 U. S. 472; Chy Lung v. Freeman, 92 U. S. 279; City v. Boatman's Ins. Co., 47 Mo. 152; Smyth v. Ames, 169 U. S. 527; Ho Ah Kow v. Nunan, 5 Sawy. 560; State ex rel. v. Railroad 145 Mo. 596; State ex rel. v. Switzler, 143 Mo. 329; Cincinnati v. Bryson, 14 Ohio, 625; Mays v. Cincinnati, 1 Ohio St. 268; Knox City v. Thompson, 19 Mo. App. 523. (5) Inasmuch as the act discriminates against manufacturers of beer as related to all other manufacturers, the tax levied under the act is not uniform and consequently the act is unconstitutional. Art. 10, sec. 3, Constitution; City of Brookfield v. Tooey, 141 Mo. 623; Rierson v. Utley, 16 Mich. 269; Desty on Taxation, p. 173, sec. 35; Cooley on Const. Lim. (6 Ed.), p. 605; City v. Grush, 151 Mo. 128; City of St. Louis v. Spiegel, 75 Mo. 145; City of St. Louis v. Spiegel, 90 Mo. 587. (6) Inasmuch as the act, by necessary implication, exempts from taxation the manufactured product of all manufacturers except those engaged in the manufacture of beer and other malt liquors, it is unconstitutional and void. Art. 10, secs. 6 and 7, Constitution; City of Brook-

field v. Tooey, supra. (7) In so far as the act levies a tax upon beer imported from foreign countries it violates the provision of the Federal Constitution prohibiting States from laying imposts or duties on imports or exports. Sec. 10, art. 1, Constitution of United States. (8) The act imposes a tax upon beer and malted liquors imported from other States. To this extent it is a regulation of interstate commerce and consequently void. Art. 1, sec. 8, Constitution of United States; LeLoup v. Mobile, 127 U. S. 640; Robbins v. Shelby Taxing District, 120 U. S. 489; Crutcher v. Ky., 141 U. S. 47; Brimmer v. Rebman, 138 U. S. 78. (9) The fines and penalties recoverable under the act are applied in violation of the State Constitution, hence, the act is invalid. Sec. 8, art. 2, Constitution. (10) The act provides for an unusual punishment for one who violates its provisions, and hence is unconstitutional. Sec. 25, art. 2, Constitution.

*Boyle, Priest & Lehmann* also for appellant.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, and *W. M. Williams* for the State.

(1) The Act of May 4, 1899, is not in conflict with the Federal Constitution. (a) It does not violate section 10, article 1 of said Constitution. Said section has reference only to duties on articles imported from foreign countries. Woodfall v. Parker, 8 Wallace, 123. (b) But under that section, whether the charge, duty or inspection fee is excessive, is not a judicial question. Congress alone has the power to revise the State laws upon that subject. Patapsco Guano Co. v. Board of Agriculture of North Carolina, 171 U. S. 345; Nelson v. Garza, 2 Woods, 287. (c) There is no discrimination against beer manufactured in other States, and hence the act

does not violate any provision of the Federal Constitution relating to interstate commerce. Henson v. Lott, 8 Wall. 148. (d) The record shows that the beer which the appellant is charged to have sold was manufactured in the State of Missouri. No question, therefore, is presented in this case involving interstate commerce. 11 Am. & Eng. Ency. of Law (1 Ed.), p. 592. (e) The Wilson Law of 1890, in any event, subjects intoxicating liquors shipped into a State to the police regulations thereof. Black on Intoxicating Liquors, secs. 76, 77 and 78. (2) The statute under consideration is not in conflict with any provision of the Constitution of this State. (a) The inspection fee exacted by it is not a tax upon property. Cooley on Taxation, 586; Black on Intoxicating Liquors, sec. 55; State ex rel. v. Hudson, 78 Mo. 303; Albrecht v. State, 34 Am. Rep. 737; State v. Frame, 39 Ohio St. 414; Senior v. Batterton, 44 Oh. St. 661; 11 Am. and Eng. Ency. of Law, p. 607. (b) "It is within the power of the Legislature to tax the liquor traffic, wholesale as well as retail, and an act providing for the taxing of such business is not a bill to raise revenue, but simply an exercise of the police powers of the State." 11 Am. and Eng. Ency. of Law (1 Ed.), 592; Black on Intoxicating Liquors, sec. 55; Kurth v. State, 86 Tenn. 134. (c) The provisions of the act under review attach to and become a part of the license law of the State, regulating the right to manufacture and sell beer. It will not do to say, therefore, that this is not a tax upon the privilege or business on the ground that the right to engage in the business is given by another statute. It was still within the power of the Legislature to impose additional conditions and burdens upon the privilege of carrying on the business. It is not necessary that all the regulations of the liquor traffic should be contained in one statute. State v. Luddington, 33 Wis. 107; Kurth v. State, 86 Tenn. 134. (d) The State has plenary power to regulate the manufacture and

sale of intoxicating liquors within its borders.    It may entirely prohibit the same, or permit it upon such terms as the Legislature imposes. The State may, in the exercise of its police powers, provide for the inspection of beer and other malt liquors by officers chosen for that purpose, and may fix the charges for such inspection.    Having the right to absolutely prohibit, it may authorize the sale and manufacture upon condition that the charges which it makes for its official inspection shall be paid into the State Treasury.    Black on Intoxicating Liquors, sec. 39; State v. Luddington, 33 Wis. 107; Vance v. Vanderhook Co., 170 U. S. 438; Albrecht v. State, 34 Am. Rep. 737; State ex rel. v. Hudson, 78 Mo. 302; Ins. Co. v. Herriott, 80 N. W. 665.    (e) There is no provision of the State Constitution which requires the charges for an official inspection to be limited to the amount of compensation paid to the officer, who may do the work for the State, and in its name.  (f) The inspection fee provided for in the act, not being a tax upon property, the objection that it is not levied according to value, and exceeds fifteen cents on the hundred dollars valuation, and that the rate is greater than that levied upon property, must fall.    Upon the same ground, the point that the act contains two subjects, and that the title is insufficient, is untenable.    An act providing for the inspection of beer and other malt liquors by State authority may properly include the charges which the State makes for that service.    State v. Austin, 10 Mo. 591; Black on Intoxicating Liquors, secs. 39 and 82.    The Act of 1899, upon this branch of the case, is in line with the law regulating the manufacture of beer as it has existed in Missouri since 1887. It has not been lawful since that date to manufacture beer except from "hops, pure extract of hops, pure barley, malt or wholesome yeast."    Sec. 2288, R. S. 1899; Laws of 1887, p. 170.    (g)  A proper construction of the act does not require the inspection to be made after the beer or other malt liquors

has been put in packages for sale, or that such packages shall be opened for that purpose. Neither does it exclude water from use in the manufacture of beer and other malt liquors. The act will be given a reasonable and sensible construction and not one that would lead to absurd consequences. Its construction in this regard has been settled by this court. State ex rel. v. Wood, 155 Mo. 425; United States v. Kirby, 7 Wall. 482; Bingham v. Birmingham, 103 Mo. 345; State v. Bulling, 100 Mo. 87; Endlich on Construction of Statutes, 344.

GANTT, J.—This prosecution is bottomed upon an act of the General Assembly of this State approved May 4, 1899, entitled, "An Act creating the office of inspector of beer and malt liquors of the State and providing for the inspection of beer and malt liquors manufactured and sold in this State." The act in full will be found in the Session Acts or Laws of Missouri 1899, p. 228. For having sold beer which had not been inspected and stamped as required by this act, defendant was indicted by the grand jury of Henry county at the May term, 1900, of the circuit court of said county, convicted, and fined one dollar. From that conviction he appeals.

The validity of the act is challenged on numerous grounds, all of which have been urged with great earnestness and ability, and controverted with like zeal and vigor by counsel for the State. The meagerness of the fine gives little or no intimation of the importance of some of the questions mooted and discussed by counsel. In the disposition of the various contentions, we can possibly do no better than to consider the propositions for reversal seriatim, as presented by the defendant.

I. The first objection (a very familiar one these days) levelled at the act is that it covers two distinct subjects, "inspection" and "revenue," in violation of section 28 of article 4 of the Constitution of Missouri, which ordains that "no bill

......shall contain more than one subject, which shall be clearly expressed in its title." For a correct appreciation of this point, it may be stated that under the title, "An Act creating the office of inspector of beer and malt liquors of the State and providing for the inspection of beer and malt liquors manufactured and sold in this State," the statute creates the office of beer inspector, the manner of his appointment, his qualifications, his right to appoint deputies, and provides the salaries of each. It then provides that every person or corporation who shall erect or keep a brewery for the manufacture of beer or other malt products in this State for the purpose of sale shall cause such beer or malt product to be inspected by said State Beer Inspector. It provides what cereals shall be used in brewing beer and other malt liquors, and prohibits all others. It provides for the stamping of all beer inspected. Sections 8, 9, and 10 of the act are as follows:

"Sec. 8. The inspector shall be entitled to receive for inspecting and gauging one cent for each gallon contained in each package, and two cents for labelling each package. All fees received by the inspector shall be paid into the State Treasury. The word package as used in this act shall be construed to mean any vessel of any kind other than pint and quart bottles in which any beer or malt liquor may be placed for sale, containing eight gallons or less; when said beer or malt liquors are placed in pint or quart bottles, a package, as used in this act, shall be construed to mean not to exceed forty-eight pint bottles or twenty-four quart bottles of beer or malt liquors, which, when manufactured and so bottled, must, before sale, be placed in suitable cases containing said number and size of bottles, for inspection and stamping by said State inspector; and when said beer or malt liquors shall be placed in vessels containing more than eight gallons, the word package shall be construed to mean each eight

Vol. 162 mo—2

gallons or fractional part thereof so contained in said vessel.

"Sec. 9. The expense of said office, including the salaries of the inspector and his deputies, shall be paid monthly out of the amount appropriated by law from the general revenue fund on warrants drawn by the State Auditor on vouchers approved by the inspector, and all fees received by the inspector under the provisions of this act shall on or before the last day of each month, be paid into the State Treasury by said inspector, and shall be placed to the credit of the general revenue fund.

"Sec. 10. Any person who shall sell any beer or malt liquors within this State which has not been inspected according to the provisions of this act, or contained in packages which shall not have upon them the certificate of the State inspector, or any person [who] shall fail to destroy said certificate or label, after the contents of said package are disposed of, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding five hundred dollars, or by imprisonment in the county jail for a period of not less than six months, and in addition thereto shall have his license or other authority, giving him the right to manufacture or sell said liquors in the State revoked, and shall not again receive any such license or other authority for a period of two years thereafter."

Addressing ourselves, first, to this point alone, we do not think the act is void because it embraces two subjects; for whether we denominate the exaction required of the brewer a "tax" or a "license fee," or an "inspection fee," if not otherwise offensive to the State or Federal constitution, it is clearly and obviously germane to the one clearly expressed subject-matter of the act, to-wit, the inspection of beer. The very mention of an inspection law suggests the exercise of police power by the State, and the requirement that the persons or things inspected shall pay for it, and that means have been pro-

vided for enforcing the act.   This objection has been so often made and so thoroughly discussed that we shall content ourselves on this occasion by restating the principle, long established and maintained by this court in its construction of this provision of our Constitution.   Said SHERWOOD, C. J., in State v. Mead, 71 Mo., loc. cit. 268:   "The principle to be readily deduced from these cases and the authorities cited is, that if any matter contained in a statute be objected to as not referred to in the title, or that the bill contains more than one subject, the objection urged will not be held well taken, if the clause or section to which objection is raised be germane to the subject treated of in the title."   In that case, the title of the act was simply "concerning popular elections," and provision was made in the body of the act for the filling of vacancies by appointment by the Governor, and it was said "there was an obvious connection and congruity" between the two ideas.   So, in this case, we hold that it was not essential to the validity of the act that it should recite in its title the moneys which the body of the act exacts of the brewer.   Whether the subject of the inspection fees is germane can not be determined by the amount of such fees, but must depend upon its otherwise natural and congruous connection with the title of the bill.   [Lynch v. Murphy, 119 Mo. 163; State v. Miller, 100 Mo. 439; Ewing v. Hoblitzelle, 85 Mo. 64; City of St. Louis v. Weitzel, 130 Mo. 614.]

By an easy transition, we are now brought to the vital proposition in this case.   It is propounded in the query of one of the learned counsel for the defendant:   "Is the act simply an inspection measure?   Is it a revenue measure?   Is it both an inspection and a revenue measure?"   Our conclusion depends largely upon the proper answer to this question.   If we can clear away all confusion on this point, the other propositions which are dependent upon it will be of comparatively easy

solution.   The insistence of the learned counsel for defendant is that it is an act to levy a general revenue or property tax, and not a police regulation.   In arriving at this conclusion, great stress is laid upon the fact that a large revenue—an amount approximating a half million dollars—is covered into the State Treasury, together with the fact that the statute requires all the fees arising under it to be paid directly into the Treasury, and that the salaries of the inspector and his deputies shall be paid out of a distinct appropriation for that purpose. Having satisfied themselves that it is simply a revenue tax, and the law a method of raising revenue only, counsel proceed to occupy two more advanced positions, to-wit, that if the Legislature intended by these inspection fees to raise revenue, the law can not stand, and that the Legislature has not an arbitrary power to prohibit the sale of beer.   Both of these propositions we answer in the negative, upon long-established principles.

As to the first, this court has answered in no uncertain language.   In State v. Hudson, 78 Mo. 305, the court said: "It does not follow because the license fee is large, or because it may become a part of the public revenue, that it is therefore a tax.   Many fines, penalties, and forfeitures become a part of the public revenue of the State that are not derived from taxation."   "The disposition of the fund derived from the license fees does not necessarily determine the character of such fees." We may add that when the subject is within the police power, as we think we shall be able to show this is, then the extent to which it shall be exercised, and the regulations to effect the desired end, are matters within the legislative discretion.   The fact, then, that a large revenue results from this price which the Legislature requires of the brewers for the privilege of carrying on their business in this State, does not establish that it is a simple revenue tax under the guise of inspection merely.

Neither do we assent for a moment to the statement that

" the power of the State to prohibit the sale of beer is not an arbitrary one, but may be exercised only because of the conviction of the people that such sale is hurtful." The limitation upon legislative power in our Constitution does not depend upon the conviction of the people as to the propriety or impropriety of the exercise of that power, save as expressed in the Constitution itself. The policy of the law is one thing; the constitutional power of the General Assembly to enact it is an entirely different thing. Can it be that because the conviction of the people is that the sale of beer is not hurtful a constitutional barrier has arisen to prevent the lawmaking branch of the government from imposing conditions and restrictions under which the business alone may be conducted? The Legislature, in the act before us, has declared that beer can only be sold or manufactured in this State upon condition that it shall be made from certain cereals only, and shall be inspected, and the inspection fees paid to the State therefor. The defendant asserts that its action in so doing is unconstitutional. We answer that under the Constitution of the State there is nothing to prohibit the Legislature from suppressing the business absolutely. We stand upon firm ground in asserting this prerogative for the legislative department. To deny it is to depart from well-settled principles. Since the decision in Austin v. State, 10 Mo. 591, it has been the established law of this State that the right to sell spirituous or intoxicating liquors is not a natural right, but is a calling which no one has the right to pursue without having first received the privilege or a license so to do from the lawful authorities of the State. In that and the subsequent cases of State v. Lemp, 16 Mo. 389, and State v. Searcy, 20 Mo. 489, it was ruled that the State has a right, in the exercise of its police power, to prohibit the sale of intoxicating liquors altogether, or permit their sale, under such regulations as it deems proper. This power was reasserted in State

v. Hudson, 78 Mo. 302; and it was further held that the high license fees imposed by Act March 24, 1883, were not "taxes," within the meaning of sections 1, 3 and 10 of article 10 of our Constitution, but a price paid for the privilege of doing a thing the doing of which the Legislature has a right to prohibit altogether. As late as Higgins v. Talty (June, 1900), 157 Mo. 280, this court, through its present chief justice, said: "No person has the right to sell intoxicating liquors in this State as a dramshop keeper without having a license from the proper authority authorizing him to do so." It was further ruled in the same case that a license to sell liquor under our laws is not a contract between the State and the licensee, nor property, in the meaning of our laws or Constitution. [State v. Davis, 108 Mo. 670.] Cases to the same effect abound in other jurisdictions. [Board v. Barrie, 34 N. Y. 667; Calder v. Kurby, 5 Gray, 597; State v. Holmes, 38 N. H. 225; Fell v. State, 42 Md. 71; Boston Beer Co. v. Massachusetts, 97 U. S. 25.] In this last-cited case the Supreme Court of the United States fully sustains the view taken by this court on this question. [See, also, Bartemeyer v. Iowa, 18 Wall. 129; Stone v. Mississippi, 101 U. S. 814; Moore v. State, 48 Miss. 147; Powell v. State, 69 Ala. 10; La Croix v. Commissioners, 50 Conn. 321; People v. Board of Com'rs of Police and Excise of Brooklyn, 59 N. Y. 92.] As said by this court in State v. Hudson, supra: "Such laws [i. e., license laws] are regarded as police regulations, established by the Legislature for the prevention of intemperance, pauperism, and crime, and for the abatement of nuisances," and are not regarded as an exercise of the taxing power. "Pursuits that are pernicious or detrimental to public morals may be prohibited altogether or licensed for a compensation to the public." [Cooley, Const. Lim. (3 Ed.), p. 727; State v. Thompson, 160 Mo. 333.]

The argument, then, of the learned counsel, that this act

transcends the legitimate office of an inspection law, in that such a law can not legitimately be employed to yield a revenue beyond the cost of inspection, is not tenable.   As was said by Chief Justice Dixon in State v. Ludington, 33 Wis. 107: "And herein, as this court conceives, consists the chief defect and fallacy of the position assumed and argued with so much ingenuity and research by the learned counsel for the respondent. They forget, as it appears to us, that the subject with which we are dealing is not one of those pertaining to the primary and fundamental rights of the citizen, and as to which no unlimited control has been vested in the Legislature.   They seem to overlook this principal ground of distinction, and argue as if the action of the Legislature was an infringement of the natural and inalienable rights of the citizen, declared and guaranteed by the Constitution, instead of the exercise of a discretionary power, against which no limit has been set by that instrument. And this, we think, is the very turning point of the controversy, namely, that the Legislature may grant or withhold authority to sell at its pleasure, and, granting such authority, it is held by the licensee at the mere pleasure or grace of the body granting it.   It is held by him, not as a matter of primary and absolute right, but as a favor, which, like all favors, must be received upon such terms and conditions, and subject to such burdens and inconveniences, as the donor thinks proper to impose, and the donee elects to accept."     [St. Louis & M. R. R. Co. v. City of Kirkwood (Mo. Sup.), 60 S. W. loc. cit. 113.]   "Unlike other trades and employments which it is the right of the citizen to pursue, undisturbed by arbitrary legislative interference and control, the person who engages in this must, within the limitations above indicated, do so subject to such disadvantages as may be presented by the lawmaking power which authorizes it."   "It is fallacious then to argue from the incompetency of the Legislature in other cases that

there exists no legislative power to make harsh and unjust discrimination or to enact inequitable and oppressive conditions upon a subject like this." As the Legislature has the power to prohibit absolutely the sale of intoxicating liquors in this State, it follows that it may, without exceeding its constitutional powers, impose any conditions or restraints upon the traffic which fall short of absolute prohibition, on the familiar principle that the greater always includes the less. The doctrine that inspection fees legitimately can not exceed the proper cost of inspection has no application to the facts of this case. That rule applies to those callings which the State may properly regulate, but has no power absolutely to suppress; but even in the latter case it is not restricted to the mere cost of inspection. [City of St. Charles v. Elsner, 155 Mo. 671.]

Having thus indicated the fundamental principles which must control in our construction of the Act of May 4, 1899, we are prepared to answer the question propounded as to the nature of the exaction prescribed by the statute. In our opinion, it is a police regulation, imposing conditions upon the business of manufacturing and selling beer and malt liquors in this State, which business the State may absolutely suppress, or permit upon such terms as the Legislature may prescribe. We construe the act in view of all its parts, and in connection with other license laws of this State, and hold that the fee exacted is the price which the State demands for the privilege of doing the business of brewing and selling beer and malt liquors in this State, and it is immaterial by what name it is called, and, being such, it is not a tax upon property, within the meaning of our Constitution, and hence the objections that it is not levied according to value, and is not uniform, and exceeds the constitutional rate, must fall with the proposition to which they are corollaries. This was clearly decided in State v. Hudson, 78 Mo. 302—a case, by the way, in which

the license fee was much more onerous and disproportionate to value, under the high license law of 1883, than that of which defendant complains in this case. Under that act it has been the common practice to exact from $1,000 to $1,500 for the privilege of running a saloon in the small cities of the State, and no question exits longer as to the constitutionality of that law.

It is proper that we should respond to the argument of counsel, to which some of our brethren accede, that certain decisions of this court require us to hold this is a property tax. State v. Tracy, 94 Mo. 217, is one of these cases. That case decides only that in the city of St. Louis the register of the city has the corresponding duty which the general statute devolves upon the county clerk, and hence it is his duty to receive merchants' statements, and to extend thereon the school tax levied by the school board of said city, that the said tax is a tax on personal property, and merchants' licenses are taxable in said city just as they are throughout the State. That case does not conflict in the least with any view we have expressed in this opinion. And to the same effect is Kansas City v. Johnson, 78 Mo. 661, the two cases being identical in principle and reasoning. In City of Brookfield v. Tooey, 141 Mo. 619, the city, under the guise of an occupation tax, by express terms levied "one per cent per annum upon the cash value of the goods, wares and merchandise on hand or to be kept on hand for the year as shown by the merchants' statements." We held that by its terms it was not an occupation tax or license tax, but was a plain advalorem tax upon the merchants of said city in an amount double the advalorem tax paid by all other owners of personal property in said city, and, being in excess of the constitutional limit, was void. We adhere to that case, but it is in no sense parallel to the case at bar. That was an attempt to levy an unconstitutional tax

upon the property of a merchant exercising a lawful right—a business which could be subjected to a reasonable occupation tax, but could not be suppressed by illegal exactions. We are here dealing with a business which has no right to exist save by the permission and license of the State, and here the tax is not levied advalorem. As to the various cases cited by counsel, holding that one State could not, under the pretense of inspection laws, make discriminations against the products and industries of other States in favor of its own products and industries, among which are Brimmer v. Rebman, 138 U. S. 78, and Minnesota v. Barber, 136 U. S. 313, the judgments in these cases are referable to an entirely distinct principle of law. They rest altogether upon the fact that the acts declared void in those cases were repugnant to that provision of the Constitution of the United States giving Congress power to regulate commerce between the States, and that other provision which declares that citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States. It was held in the Barber case, and the principle is the same in the others, that, although the statute was not avowedly or in terms directed against the bringing into Minnesota of the products of other States, its necessary effect was to burden or restrict commerce with other States, as involved in the transportation into that State, for purposes of sale there, of all fresh beef, veal, mutton, lamb, or pork, however free from disease may have been the animals from which it was taken. The inspection laws in those cases were condemned on the grounds above mentioned, and a discussion of that line of cases is obviously foreign to the matter we have in hand. If Federal cases are deemed necessary to this discussion, they abound. In the License cases, 5 How. 504, the question was whether certain statutes of Massachusetts, Rhode Island, and New Hampshire, relating to the sale of spirituous liquors, were

repugnant to the Constitution of the United States. In determining that question, it became necessary to inquire whether there was any conflict between the exercise by Congress of its power to regulate commerce with foreign States, or among the several States, and the exercise by a State of what are called "police powers." Chief Justice TANEY said: "If any State deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice, or debauchery, I see nothing in the Constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper." Mr. Justice GRIER, affirming the same principle, said: "It is not necessary, for the sake of justifying the State legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime which have their origin in the use or abuse of ardent spirits. The police power, which is exclusively in the States, is alone competent to the correction of those great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority." [See, also, Boston Beer Co. v. Massachusetts, 97 U. S. 25; Foster v. Kansas, 112 U. S. 201; Gibbons v. Ogden, 9 Wheat. 1; Mugler v. Kansas, 123 U. S. 623.]

In the last-mentioned case it was said: "There is no justification for holding that the State, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional right; for we can not shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety may be endangered by the general use of intoxicating drinks, nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, to some degree at least, traceable to this evil."

The Patapsco Guano Co. v. Board of Agriculture of

North Carolina, 171 U. S. 345, is cited. In that case the act imposed a charge of twenty-five cents per ton on commercial fertilizers, and, on appeal to the Supreme Court of the United States, it was held a proper inspection law; but what is more apposite to this discussion is the language of the court. It says, quoting Mr. Justice BRADLEY in Neilson v. Garza, 2 Woods, 287, involving the validity of a law of Texas: "Then we are brought back to the question whether the law is really an inspection law. If it is, we can not interfere with it on account of supposed excessiveness of fees."

Voight v. Wright, 141 U. S. 62, is also cited, but a reference to the case will show it was decided on the ground that the statute of Virginia was repugnant to the commerce clause of the Constitution of the United States, and hence does not meet the question we are considering.

It will only be necessary to note one more case in this connection, and that is Willis v. Standard Oil Co., 52 N. W. 652, 50 Minn. 290. The act in that case was sustained, the court saying: "On its face, this law is bona fide police regulation, a proper inspection law, and the fees are in good faith exacted to reimburse the State in the expense of inspection and enforcing observance of the law." But we may add that the subject-matter of that act (coal oil) also was one which only required regulation, and was not one, as in this case, under the ban of the law, and which could only be sold by virtue of a license in the first instance.

We proceed to notice other objections to the act.

Counsel say that in Missouri "the manufacture and sale of beer are permitted upon precisely the same conditions that the manufacture and sale of other commodities are permitted. Brewers are classified with manufacturers and merchants." Granting this was so prior to the passage of the Act of May 4, 1899, surely this worked no estoppel upon the Legislature

State v. Bixman.

which forbade it legislating further on this subject, or changing the laws governing the manufacture or sale of beer and other malt liquors. While former legislatures were free to enact such regulations as they saw fit on this subject, they not only did not attempt to bind succeeding legislatures, but in the exercise of this police power they were without authority to estop, not only their successors, but themselves. In their endeavor to narrow the power of the Legislature to temperance measures only, in dealing with this subject counsel for defendant take too restricted a view of the police power. It is perfectly competent for the Legislature to decline to prohibit the manufacture and sale of beer and other ardent spirits, but to require à more wholesome article for those who drink it. The State has had throughout its history laws against the adulteration of liquors and foods, and certainly experience has demonstrated the wisdom and necessity of such laws. In the dispatches of the twelfth inst., it is reported that the city analyist of London testified, at a beer-poisoning inquest, that from samples examined and tested by himself the average weekly consumption of beer in Liverpool would contain three hundred pounds of arsenic—enough to kill a million people, if administered in equal doses, and one at a time.

Without intimating the beer manufactured in this State contains poisons, it is perfectly clear that the Legislature may, from time to time, take such precautions and prescribe such regulations as will tend to prevent the manufacture of impure and unwholesome beer and malt liquors, and the greater the quantities used the more need there is and will be for a wise and effective inspection. As to what is the public policy of the State on this subject, we must look at the laws enacted by the representatives of the people, and this act is an expression of what they deem is the correct public policy. That policy may change, but it is our duty to discover it from the laws

State v. Bixman.

already enacted, if possible.

Learned counsel strenuously urge that this case can not be a tax or burden placed upon the business, in contradistinction to a tax upon property, as we have hereinbefore decided, because, they say, an occupation tax involves two elements— payment of a fixed amount for a fixed time, and a permit to carry it on for a fixed time. This assumes that in some way the Legislature is restricted to this exact method, but we hold that it is competent for the Legislature to fix the amount in proportion to the business done or the output sold as in this case. That is a matter for the lawmaking power to determine, and, as we have already said, it does not follow that a license must issue for a fixed period. The imposition of the tax is one thing; the license, another. Certainly, a statute providing for licensing the manufacture and sale of beer, and containing the inspection features of the act before us, and requiring the payment of the fees prescribed therein as a condition precedent for carrying on the business under such license, would be a valid exercise of police power, and such is the effect of this law when considered with the other statute in *pari materia*. Much indignation is expressed in one of the briefs that the Legislature has assumed to itself to prescribe the cereals which shall be used in the manufacture of beer, especially in excluding wheat and corn. Counsel assume that these two cereals make a perfectly innocuous beer. As to this we need only say that the Legislature can absolutely prevent the brewing of beer or other intoxicating liquor if it sees fit, and in the exercise of its police power it may exclude any cereal that in its judgment would be deleterious to the health of the people of this State, and, if there be a doubt as to the noxious character of the cereal, then the legislative determination of the fact is conclusive. This court can not say, as a matter of judicial knowledge, that the fusel oil, resulting from the oily substance in corn,

is not deleterious in beer made from corn. In the course of the argument, it appeared that, in a congressional investigation of food products, Mr. Adolphus Busch, a brewer of great experience, testified that he never used corn in making beer; that corn and barley did not make a high grade beer; that fusel oil was not a particularly healthy article. However, the sale of intoxicating liquors is not a natural right, and the State may prescribe how they shall be made for sale, if at all.

Counsel say that this act is a new departure in industrial legislation. But in this they are mistaken. The law of this State has forbidden the use of corn and wheat in the making of beer since 1887. [R. S. 1899, sec. 2288; R. S. 1889, sec. 3889.]

Again, it is insisted that the fee charged by the State for the inspection can not be an exaction from, or tax upon, the privilege of carrying on the business, because the act does not confer the right to sell beer and malt liquors; that this privilege is conferred by another statute. But it must be evident this contention is not sound. It is said in Cooley, Tax'n (2 Ed.), 596, note: "But there is no necessary connection whatever between them [i. e., license and taxation]. A business may be licensed, and not be taxed; or it may be taxed, and yet not licensed. And so far is the tax from being necessarily a license that provision is frequently made by law for the taxation of a business that is carried on under a license existing independent of the tax." In the License Tax cases, 5 Wall. 462, the question in those cases was: Can the defendants be legally convicted upon the several indictments found against them for not having complied with the acts of Congress by taking out and paying for the required licenses to carry on the business in which they were engaged, such business being wholly prohibited by the laws of the several States in which it was carried on? Chief Justice CHASE wrote the opinion, in which all the

justices concurred, in which it was held that the licenses granted by the United States under the Act of 1864 and the amendatory acts, conveyed to the licensee no authority to carry on the licensed business in the State; that the requirement of payment for such licenses was only a mode of enforcing the payment of the taxes; and that court rejected the defense depending on the postulate that a license necessarily conferred an authority to carry on the licensed business, and conceded that Congress had no authority to interfere with the business of citizens transacted within a State, except such as was strictly incidental to the exercise of the powers clearly granted to it, and the power to license a lottery or the sale of intoxicating liquors in a State was plainly repugnant to the exclusive power of the State over those subjects. Not only do those cases decide that a tax does not confer authority to carry on a business, but the case is exceedingly instructive in showing that courts, in the construction of laws, do not stick in the letter, but look for the intention and meaning, of the law, and construed license to mean a mere form of imposing a tax.

But for the great respect we have for the learned counsel who urge that the Legislature have excluded the use of water in the manufacture of beer, we would not deem it necessary to notice the point. This law and all laws will be given a reasonable construction, not one that is absurd. Water, of course, must be used in the brewing of beer. The Legislature, in directing that the person or corporation brewing beer in this State shall not use any substance, material or chemical, other than pure hops, or pure extract of hops, or pure barley, malt, or wholesome yeast, or rice, never once thought it necessary to include water. In neglecting to specify it, the Legislature can hardly be charged with inaccuracy of terms, inasmuch as Webster in his lexicon defines beer to be "a fermented liquor made from any marketed grain, but commonly from barley

malt, with hops, or some other substance to impart a bitter flavor;" and this definition, we opine, has never been deemed unintelligible because it omits the mention of water.    This point is too attenuated for serious consideration in the practical administration of justice.

But still again, it is said the law can not be executed without a destruction of the beer, and is incapable of enforcement on that account, and because the force of inspectors is too small. In State v. Wood, 155 Mo. 425, speaking of this same contention, we held the act must be given a reasonable construction. We held then that the act did not require or contemplate the opening of each barrel or bottle of beer after it was closed. Section 7 simply provides:   "It shall be the duty of such inspector to cause to be inspected all beer or other malt liquors brewed or manufactured or sold in this State, and if he shall find that such beer or other malt liquors has been made of pure hops or the pure extract of hops or of pure barley, malt, or wholesome yeast, or rice, to place upon the package containing such beer or malt liquor his label certifying that the same has been inspected and made from wholesome ingredients."    Standing alone, there can be no doubt that this section does not require the inspector, in making his inspection, to defer it until after the beer is sealed in the barrels or bottles. He is commanded to inspect the beer, and ascertain that it is made from pure hops, or extract of hops, or of pure barley, malt, or wholesome yeast, or rice; and, after it is placed in packages such as are defined in section 8, if it comes up to the standard fixed by the statute, to put his certificate thereon. But it is contended that when we consider section 8 the necessary inference is that it must be done after the barrels and bottles are sealed and put in suitable cases, because that section, after defining the word "package" to mean any vessel contain-

Vol. 162 mo—3

ing eight gallons of beer or malt liquor, and, when in pint bottles, to be forty-eight pint bottles; and when in quart bottles, twenty-four quart bottles, provides, "which [beer], when manufactured and so bottled, must, before sale, be placed in suitable cases containing said number and size of bottles, for inspection and stamping," etc. Granting that it must be done after bottled and put in the cases, still it does not require each bottle and keg or barrel to be opened, but the inspector may take a sample from the various cases at random, and test it, and, as the brewer can not know beforehand what bottle he will open, the danger of deception or fraud will be reduced to the merest possibility. As well might we say that an inspector of wheat or corn is required to handle and see each grain. No such minute inspection is contemplated in inspecting grain, and there is less danger of imposition in inspecting beer, as we have suggested. The efficacy of such an inspection rests to a great extent upon the very uncertainty of the bottle which the inspector may select in making his test. But, reading the whole act together, we are clear that the inspector is not restricted to an examination or analysis of the finished product after it is bottled or barreled, but he is authorized to go directly to the brewery, and take a sample of the mash and of the beer in the vats in the process of fermentation. This method would not seriously interfere with the operations of the brewers, and, on the other hand, would enable the inspectors to test large quantities by one sample. This latter method is the one which the state inspector has approved. In State v. Wood we ruled that we would give this statute a reasonable construction; one that would effectuate the obvious intention of the Legislature, if possible. In Bingham v. Birmingham, 103 Mo. 352, it was said by this court: "In pursuing this course we do but follow well-approved precedents, and allow the reason of the law to prevail over its letter; 'for the letter killeth, but the

spirit maketh alive.' 2 Cor. iii, 6. The presumption is that the Legislature never intended to enact an absurd law, incapable of being intelligibly enforced. [St. Louis & S. F. Ry. Co. v. Evans & Howard Fire-Brick Co., 85 Mo. 329; State v. Bulling, 100 Mo. 93."] In harmony with this ruling, the word "inspection" in the eighth section can be ignored, and the law rendered entirely harmonious. As we have pointed out at least two methods by which this inspection may be made, neither of which will result in the destruction of the defendant's beer, and as it is plain the officer whose duty it is to enforce the law does not contemplate a course so destructive and unreasonable, we hold that the statute does not require the destruction of the beer in enforcing the law.

Inspection of milk obtains in a number of States, and the dairymen are required upon demand to furnish the inspector with a sample of the milk for analysis—in some cases, a half pint—and it is ruled that this is a reasonable regulation of this perfectly lawful business, and that the trifling injury occasioned by the taking of samples is not such a taking of property for public use as to require compensation to be made therefor. Such loss is a necessary incident to the enforcement of the statute. [State v. Dupaquier, 46 La. Ann. 577; Bancroft v. City of Cambridge, 126 Mass. 438; Com. v. Carter, 132 Mass. 12; Shivers v. Newton, 45 N. J. Law, 478.]

Holding, as we do, that this is not a property tax, but a proper police regulation of an otherwise inhibited article, of course it is not open to the objection that it exceeds the rate of property taxation; but counsel urge another view, and it is this: Treated as a charge or fee, they say the exaction is not uniform, because it is imposed upon the business of those who manufacture and sell beer and malt liquors only, and not upon the business of all who deal in intoxicating liquors—other liquors as well as beer and malt liquors. In other words, the

objection is that in segregating the manufacture and sale of beer and malt liquors the Legislature has made an arbitrary classification, and thus unjustly imposes a burden upon this particular kind of business, when, if imposed at all, it should be upon the business of all who are engaged in the manufacture and sale of intoxicating liquors of every kind; that it is class legislation.  To this we do not assent.  The State is under no obligation to permit the manufacture of any kind of intoxicating liquors.  It may impose one kind of restrictions upon one kind of intoxicants and another kind upon another sort. The counsel really answer their own proposition.  They say that a distinction is made in many States and countries between beer and other intoxicating liquors, so that it seems not unreasonable in the Legislature to make a distinction so generally made.  Congress has made a distinction between fermented liquors, such as beer and other malt liquors, and distilled spirits, and provided different taxation and regulations for each. The manufacture of the two kinds of liquors is so different that no doubt can exist as to the power and propriety of the Legislature imposing different regulations as to the two.  When this is so, it is a matter within the legislative discretion, and it is not the province of the courts to interfere with it.  As said by counsel for the State, the constitutional question is, "Can beer be properly put in a class by itself?"  The defendant answers, "Yes, if the regulation be less rigorous as to it than other intoxicating liquors."  In Timm v. Harrison, 109 Ill. 601, it was insisted that no distinction could lawfully be made between "liquor dealers," but the Supreme Court of Illinois said:  "We think it is competent for the General Assembly to classify the different kinds of liquor dealers, and impose differential taxes upon such classes. . . . . The line of division into classes based upon the sale of malt liquors as distinguished from more intoxicating drinks, if viewed as for taxation, is a

quite natural and reasonable one. In the exercise of the police power the Legislature might prohibit altogether the sale of such liquors, and may attach such conditions to the allowance of their sale as it sees fit to prescribe." In Senior v. Ratterman, 44 Ohio St. 661, the proposition was advanced that a law of Ohio, so far as it might be held to apply to wholesale dealers, was in violation of section 2, article 12, of the State Constitution, because the act imposing burdens upon them is for revenue only and not uniformly imposed, in that there was unjust discrimination against the wholesale dealer and in favor of the holder of other classes of property, and against the former, and in favor of the manufacturer. The court answered: "The law does not purport to be for revenue, but to provide against evils; and to construe it as a revenue law it must be shown that there are no evils incident to the wholesale traffic, and in contemplation of law none can arise—a proposition which can not be maintained. The law, as to its taxing features, operates upon a business, and not upon property, within the meaning of the section referred to, and hence is not required to be uniform to all forms of traffic or to all classes." A difference was made between a manufacturer and a wholesaler, and it was held proper classification. In Express Co. v. Seibert, 142 U. S. 339, it was held that a statute of this State which defined an express company to be persons and corporations who carry on the business of transportation on contracts for hire with railroad or steamboat companies, does not invidiously discriminate against the express companies defined by it and in favor of express companies carrying express matter on other conditions and under different circumstances. We hold that it was competent for the Legislature to select beer and other malt liquors as the subject of this excise duty without imposing it upon all dealers in spirituous liquors.

The fifth section of the act in controversy provides that

"every person, persons, or corporation who shall receive for sale or offer for sale any beer or other malt liquors other than those manufactured in this State shall upon receipt of the same and before offering the same for sale, notify the inspector, who shall be furnished with a sworn statement from the manufacturer thereof or other reputable person having knowledge of the composition of said beer or other malt liquor" that it complies with the statute as to the material therein; and then he shall inspect and stamp it, and receive the same fees, etc. It is now insisted that this violates the right of interstate commerce. What interest defendant, who is charged and convicted of selling beer manufactured in this State, has in this point, it is difficult to see; but we are satisfied that, inasmuch as our statute only essays to act upon this beer imported from other States after it has reached its destination in this State, and subjects it to our police regulations, it seems too plain for discussion that, whatever question might have existed as to the right of the State prior to the act of Congress known as the "Wilson Act," passed August 8, 1890, since its enactment it can no longer be doubted that "all fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory are, upon arrival in such State or Territory, subject to the operation and effect of the laws of such State or Territory enacted in the exercise of police powers, to the same extent and in the same manner as though such liquors or liquids had been produced in such State, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." [Rhodes v. Iowa, 170 U. S. 412; Act Aug. 8, 1890, c. 728 (26 Stat. 313); Rahrer's Case, 140 U. S. 545; Vance v. W. A. Vandercook Co., 170 U. S. loc. cit. 445.] Inasmuch as there is no discrimination against the imported beer, but it is subjected to the same burdens and inspection as the home product, it is obvious that in this respect, at least, there

has been no infraction of the Constitution of the United States. [Hinson v. Lott, 8 Wall. 148.]

As to the charge that it violates section 10 of article 1 of the Constitution of the United States, which declares that "no State shall without the consent of Congress lay any imposts or duties upon imports or exports except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any State on imports or exports shall be for the use of the treasury of the United States, and all such laws shall be subject to revision and control of the Congress,"—it is the settled judicial construction of this section that it refers only to imports from foreign countries, and not from one State into another; but, even if our inspection law is held to be excessive as to imports, it is not subject to judicial review, but must stand till Congress shall see fit to alter it. [Neilson v. Garza, 2 Woods, 287; Patapsco Guano Co. v. Board of Agriculture of North Carolina, 171 U. S. 345.] But, as defendant was convicted of selling uninspected beer, which was manufactured in this State, the question as to imported beer can not be raised by him.

As to the charge that this act violates the fourteenth amendment to the Federal Constitution, it need only be said that the fourteenth amendment was never designed to prevent a State from adjusting its system of taxation, or to interfere with the exercise of its exclusive right to make all proper police regulations to promote the health, peace, morals, education or good order of its people, so long as some particular provision of the Constitution of the United States is not infringed. [Barbier v. Connolly, 113 U. S. 27; Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 238.]

Lastly, it is argued that because the thirteenth section of the act provides that all beer or other malt liquors manufactured in this State and exported outside of this State for sale

shall be inspected as other liquors designated in this act, but said inspection shall be free of cost to the manufacturer, "it makes an unfair discrimination in favor of those who sell their product out of this State." It will be observed that this section applies alike to all manufacturers of beer in this State. It gives free inspection to each for that portion of his beer which he exports. It requires an inspection fee to be paid upon every gallon sold in this State. It provides absolute equality as to all who sell in the State, and accords the same exemptions to all who elect to sell out of the State. Counsel say the man who sells four-fifths of his product outside of the State only pays inspection fees on one-fifth of his products, whereas the brewer who brews for home consumption alone pays on every barrel. But counsel seemingly forget that the right to export is free alike to all who avail themselves of it, and the law is not rendered unequal because the convenience of one brewer dictates to him to sell one-half of his product in the State, and export the other half, while another brewer may find it to his interest to sell entirely in the State. The rights of each are uniform, whether they sell in the State or out of it. The law is not responsible for the inequalities which the several brewers may work out in their efforts to dispose of their product. The law exacts that every brewer, foreign as well as domestic, who sells in the State, shall pay the same inspection fees or price for the privilege of selling in this State, and shall submit to the same inspection; on the other hand, the law exempts all brewers who export from paying these fees. As this is not a property tax but is a matter pertaining to the police power of the State, there is nothing in our Constitution which forbids such exemption. As the brewers who sell in the State do so purely as a matter of grace, it does not lie in their mouths to complain of the terms upon which they are allowed to carry on their business, or the exemptions granted to them. It is entirely

State v. Bixman.

competent for the Legislature to put exporters in one class and domestic dealers in another. The burdens provided by this act are intended to lessen the evils resulting from the traffic. The evils that result from the use of intoxicating liquors generally occur at the place where they are consumed, and the tendency to crime and pauperism follows in that place, and it can readily be seen why a Legislature would make a discrimination between the burden on a business which naturally breeds disorder, and which casts upon the general taxpayer an additional burden in the cost of prosecutions and increased police force, and a business which exports the intoxicating liquor to other States. It is an obvious classification, one which the Legislature can and must make. Recurring again to the fundamental principle underlying the law, we hold it was clearly within the power of the Legislature to make the exemption as to export beer. It has drawn the line between the distillery and the brewery. It has fixed the place and the price for the privilege of running a saloon. It requires a license and a bond to keep' an orderly house, and now it has taken this step forward in the interest of health and well-being of society. It is a matter within the exclusive jurisdiction of the Legislature, and we find nothing in it which renders it obnoxious to either the State or Federal Constitution, and accordingly the judgment of the circuit court must be and is affirmed. *Brace, Marshall* and *Valliant, JJ.,* concur.

BURGESS, C. J. (dissenting).—Not being able to concur in the opinion of the court in this case, I have thought it best to give my reasons for declining to do so.

At the May term, 1900, of the circuit court of Henry county, the defendant was convicted by the court, a jury being waived, and his punishment fixed at a fine of one dollar, under an indictment charging him with having at said county, on the

twenty-sixth day of May, 1900, knowingly and unlawfully sold and disposed of to one H. C. Jones one pint of lager beer from a keg of beer containing eight gallons without having on said package from which said pint was sold, to-wit, said keg containing eight gallons of lager beer, the certificate of the State inspector of beer certifying that said package of lager beer had been inspected by him, and was made from wholesome ingredients, and which said beer had not been manufactured and brewed outside of Missouri, and received for sale in this State, and which had not been made for manufacture and sale out of this State. Having failed in his motions for a new trial and in arrest, defendant has appealed to this court.

The indictment was drawn under section 10 of an act of the General Assembly entitled "An Act creating the office of inspector of beer and malt liquors of the State, and providing for the inspection of beer and malt liquors manufactured and sold in this State," approved May 4, 1899, which said act reads as follows:

"Section 1. There is hereby created the office of beer inspector which shall be filled by appointment by the Governor by and with the consent of the Senate, within thirty days after taking effect of this act, an inspector of beer and malt products, who shall serve for a term of four years and until his successor is duly appointed and qualified. He shall be an expert beer brewer and a citizen of the United States and of this State for more than two years next prior to his appointment. He shall give a bond in the sum of twenty-five thousand dollars, to be approved by the Governor, for the .... faithful performance of the duties of his office.

"Sec. 2. Said inspector shall, with the approval of the Governor, appoint such deputies as may be required to carry out the provisions of this act, not to exceed four in number, and such clerical help as may be necessary. Said deputies

shall each receive for their services the sum of fifteen hundred dollars per annum, and said inspector shall receive the sum of three thousand dollars per annum, all salaries and expenses to be paid out of the sums of money now, or that may hereafter be, appropriated for said purpose.

"Sec. 3. Every person, persons or corporation who shall erect or keep a brewery for the manufacture or brewing of beer or other malt products within this State, for the purpose of offering the same for sale, shall cause the same to be inspected by the said state inspector.

"Sec. 4. No person, persons or corporation, engaged in the brewing or manufacture of beer or other malt liquors, shall use any substance, material or chemical in the manufacture or brewing of beer or other malt liquors other than pure hops or pure extract of hops, or of pure barley, malt or wholesome yeast, or rice.

"Sec. 5. Every person, persons or corporation who shall receive for sale or offer for sale any beer or other malt liquors other than those manufactured in this State shall, upon receipt of same, and before offering for sale, notify the inspector, who shall be furnished with a sworn affidavit, subscribed by an officer authorized to administer oaths, from the manufacturer thereof, or other reputable person having actual knowledge of the composition of said beer or other malt liquors, that no material other than pure hops or the extract of hops, or pure barley, malt or wholesome yeast, or rice, was used in the manufacture of same; upon the receipt of said affidavit, the inspector shall inspect and label the packages containing said beer or malt liquors, for which services he shall receive like fees as those imposed upon the manufacturers of beer and malt liquors in this State.

"Sec. 6. The inspector appointed under this act shall provide himself with an office, and shall record on books kept

for that purpose the names and places of business of all persons engaged in the manufacture, brewing and sale of beer and malt liquors. He shall keep a record of all beer and malt liquors manufactured, brewed or sold and the amount produced by each brewery or manufacturer or sold by dealer. He shall keep a record of all fees collected and all expenditures incurred, and shall make a full and complete report of the same to the Governor upon the first day of each year.

"Sec. 7. It shall be the duty of such inspector to cause to be inspected all beer or other malt liquors brewed or manufactured or sold in this State, and if he shall find that such beer or other malt liquor has been made from pure hops or the pure extract of hops, or of pure barley, malt or wholesome yeast, or rice, to place upon the package containing such beer or malt liquor his label, certifying that the same has been inspected and made from wholesome ingredients.

"Sec. 7a. It shall be the duty of the State Treasurer upon the taking effect of this act to provide suitable and inimitable State certificates and labels for this inspection, gauging and labeling, having on each proper place for countersigning by the State Treasurer and inspector, and shall safely keep the same together with the plates used in making them, when not in actual use. The State Treasurer shall from time to time, upon demand, deliver the aforesaid labels to the inspector, taking therefor his receipt, and shall charge said inspector with the same; and shall from time to time as said inspector makes returns of moneys collected in the course of his inspection credit said inspector's account with such sums and shall keep a true and correct book account of his dealings with said inspector.

"Sec. 7b. It shall be unlawful for any person to attempt to make or make, to attempt to sell or sell, or attempt to use or use any of the certificates, or labels or both provided for by this act, or imitations thereof, except such persons as by law

are allowed to make, sell and use the same, and any person so offending shall be deemed guilty of a felony, and, upon conviction, be punished by imprisonment in the penitentiary for a term not to exceed five years.

"Sec. 8. The inspector shall be entitled to receive for inspecting and gauging one cent for each gallon contained in each package, and two cents for labeling each package. All fees received by the inspector shall be paid into the State Treasury. The word 'package,' as used in this act, shall be construed to mean any vessel of any kind other than pint and quart bottles in which any beer or malt liquor may be placed for sale, containing eight gallons or less; when said beer or malt liquors are placed in pint or quart bottles a package, as used in this act, shall be construed to mean not to exceed forty-eight pint bottles or twenty-four quart bottles of beer or malt liquors, which, when manufactured and so bottled must, before sale be placed in suitable cases containing said number and size of bottles, for inspection and stamping by said state inspector; and when said beer or malt liquor shall be placed in vessels containing more than eight gallons, the word package shall be construed to mean each eight gallons or fractional part thereof so contained in said vessel.

"Sec. 9. The expense of said office, including the salaries of the inspector and his deputies, shall be paid monthly out of the amount appropriated by law from the general revenue fund on warrants drawn by the State Auditor on vouchers approved by the inspector, and all fees received by the inspector under the provisions of this act shall, on or before the last day of each month, be paid into the State Treasury by said inspector, and shall be placed to the credit of the general revenue fund.

"Sec. 10. Any person who shall sell any beer or malt liquor within this State which has not been inspected according

to the provisions of this act, or contained in packages which shall not have upon them the certificate of the state inspector, or any person who shall fail to destroy said certificate or label after the contents of said package are disposed of, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine not exceeding five hundred dollars, or by imprisonment in the county jail for a period of not less than six months and in addition thereto shall have his license or other authority, giving him the right to manufacture or sell said liquors in this State revoked, and shall not again receive any such license or other authority for a period of two years thereafter.

"Sec. 11.    If any inspector shall fail to perform any of the duties imposed upon him by this act, or shall in any manner violate any of the provisions thereof, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the county jail for not less than thirty days and by a fine not exceeding one thousand dollars, and if any said inspector shall fail to faithfully perform the duties enjoined upon him by this act he may be removed from office by the Governor.

"Sec. 12.    All prosecutions for fines and penalties under the provisions of this act shall be either by indictment or information in any court of competent jurisdiction, and when collected shall be paid one-fourth to the informer and three-fourths into the fund for the construction of public roads and highways in the county in which said offense may have been committed and prosecution begun.

"Sec. 13.    All beer or other malt liquors manufactured in this State and exported outside of the State for sale, shall be inspected as other liquors designated in this act, but said inspection shall be free of cost to the manufacturer.

"Sec. 13a.    Every railroad, express or transportation

·company, shall when requested furnish to the inspector a duplicate bill of lading or receipt showing the name of the consignor and consignee, date, place received, destination and quantity of beer or malt liquors received by them for shipment to any point within this State. Upon failure to comply with the provisions herein, said railroad, express or transportation company shall forfeit and pay to the State of Missouri the sum of fifty dollars for each and every failure, to be recovered in any court of competent jurisdiction. The inspector herein provided for, is hereby authorized and empowered to sue in his own name at the relation and to the use of the State. The penalties collected shall be paid into the State Treasury.

"Sec. 14. There is hereby appropriated out of the State Treasury, chargeable to the general revenue fund, for the years 1899 and 1900, for the pay of the inspectors, six thousand dollars; for the pay of four deputies, twelve thousand dollars; for rent, stationery, fuel, printing, and such other things as may be necessary for the transaction of the business of said inspector, the sum of six thousand dollars."

Upon the trial, defendant admitted the sale of the beer drawn from a keg which did not contain the label or certificate of the inspector, as charged in the indictment, and gave in evidence the following agreed statement of facts, to-wit:

"1. This prosecution is for an alleged violation of the act entitled 'An Act creating the office of inspector of beer and malt liquors of the State, and providing for the inspection of beer and malt liquors manufactured and sold in this State, approved May 4, 1899.

"2. There are and have been in the State of Missouri for more than a year last past, twenty-seven breweries owned and kept by persons and business corporations engaged in manufacturing or brewing beer within this State for the purpose of ·offering the same for sale.

"3.   Said persons and corporations manufacture annually in this State not less than 2,250,000 barrels of beer of thirty-one gallons each, to-wit, 69,750,000 gallons.   That of the quantity manufactured 1,275,000 barrels of thirty-one gallons each, to-wit, 39,525,000 gallons, are sold in Missouri, and 975,000 barrels of thirty-one gallons each, to-wit, 30,225,000 gallons, are exported.   That the average net value of said beer to the brewer, after deducting the United States tax, is five dollars per barrel.

"4.   The entire product of twelve of said breweries is sold in the State of Missouri; the larger portion of the product of twelve other of said breweries is sold in this State; and of the remaining three breweries two-thirds of the product of one, four-fifths of the product of another, and more than one-half of the product of the third is sold outside of the State.

"5.   There are annually imported into the State of Missouri, for sale therein, from neighboring States, and particularly from the States of Illinois and Wisconsin, 165,000 barrels of beer of thirty-one gallons each, to-wit, 5,115,000 gallons; and that said beer is of the value of five dollars per barrel.   In addition, beer and ale are imported from foreign countries, and a malted liquor, brewed from wheat, and called 'weiss beer,' is manufactured and sold in Missouri.

"6.   Beer must, for the purposes of sale, be inclosed in tight packages of glass or wood.   It is put up in barrels, half barrels, kegs, eighths, and bottles; and when so inclosed the packages can not be opened, except for immediate consumption, without rendering the beer stale, flat, and valueless.

"The State hereby reserves all objections as to the relevancy of the facts above admitted.   Each party reserves the right to offer further evidence not inconsistent with the facts above admitted."

Defendant called as a witness Ellis Wainwright, who

stated that he is a practical brewer, and has been for thirty years, and is familiar with the manufacture of beer. The witness was asked what cereals, in his opinion, are wholesome, and may properly be used in the manufacture of beer, to which question the State objected upon the ground that it is entirely within the jurisdiction of the Legislature to determine what cereals shall be used in the manufacture of intoxicating liquors. The court sustained the objection, and excluded the evidence, to which action of the court the defendant excepted.

Defendant then offered to prove that corn, wheat, and rye are wholesome cereals, and may be properly used in the manufacture of malt liquors. The State objected to the offer, and the court sustained the objection, and excluded the evidence, to which action of the court the defendant excepted.

The defendant asked the witness whether either distilled or fermented liquors could be produced without water, whereupon the State admitted that water is a necessary ingredient for the manufacture of beer.

Witness was asked whether, in his opinion, an inspection of beer or malt liquors will reveal the cereals of which it is made, and he answered that no examination or analysis of the finished product will show the cereals used in its manufacture.

From the further examination of the witness it appeared that the basis of all the cereals is starch; that there is no difference between the starch found in rye, wheat, corn, or barley; that the barley malt, rice or other cereals used in the manufacture of beer, before undergoing the process called "mashing," are ground as fine as powder, and in that condition are put into a large vessel with water, and are heated and stirred to produce an infusion. This treatment is called the "process of mashing," and results in a sweetish liquid, called "worts," from which ultimately, after the addition of hops and yeast,

Vol. 162 mo—4

by the process of fermentation and ripening, beer is produced. The witness was asked on cross-examination whether at any time during the six or eight hours of the process of mashing, an examination or analysis would show what cereals are in the mashing tub, to which question defendant objected on the ground that the act itself specifies when the inspection shall be made, in that it provides that the beer shall be inspected in the vessel in which it is put upon the market for sale. The court overruled the objection, and defendant excepted.

Defendant also offered to show by the witness that there is a malt liquor in use in Missouri that is made and can be made only of wheat. The State objected to the evidence, and the court sustained the objection, and excluded the evidence; to which defendant excepted.

The witness was asked whether the beer could be analyzed with a view of determining its ingredients, and he answered, "beer can be analyzed." Being asked by defendant what process that involved, and how long it would take, he answered: "An analysis of beer would require a sample of perhaps two quarts. It would take about three or four days to make a thorough analysis, and then at the end of that time you could not tell out of which cereal it was manufactured." The State, in rebuttal, called G. R. Kenamore, the state inspector, who admitted he is not a practical brewer, and has never brewed a drop of beer in his life, but by reason of his experience in the internal revenue department of the general government, and by his reading on the subject, gave it as his opinion that beer could be inspected in the mash, and the cereals of which it is made determined. Defendant moved to strike out the testimony of the witness because an inspection of the mash is not authorized by the law, and because the act prescribes when and in what condition of the finished product the inspection shall

be made, which motion the court overruled, and the defendant excepted.

The defendant asked the court to declare the law to be as follows:

"1. Upon the law and the evidence in this cause, the jury are instructed to acquit the defendant.

"2. The Act of May 4, 1899, entitled 'An Act creating the office of inspector of beer and malt liquors of the State, and providing for the inspection of beer and malt liquors manufactured and sold in this State,' contains two subjects—one the inspection of beer and malt liquors, and the other the subject of revenue for general State purposes. The latter subject is not expressed in the title of the act. The court declares that said act violates section 28 of article 4 of the Constitution of Missouri, and is therefore void.

"3. It is admitted that beer must, for purposes of sale, be inclosed in tight packages of glass or wood, and that, when so inclosed the package can not be opened, except for immediate consumption, without rendering the beer stale, flat, and valueless. The method of inspection prescribed by said Act of May 4, 1899, requires that the beer or other malt liquor shall be inspected in the vessel in which it is placed for sale; and the court instructs you that such act of inspection is equivalent to the taking of such beer from the owner without due process of law, and is in violation of the Constitution.

"4. The expense of inspection is fixed by said act at $12,000 annually, and the act provides that all collections made under it by the inspector and his deputies shall be paid into the State Treasury, and be placed to the credit of the general revenue fund. The fees allowed by said act for inspecting and gauging are one cent per gallon and two cents for labeling each package; every eight gallons or less contained in a vessel, and every case of forty-eight pint bottles or twenty-four quart bot-

tles of beer, being deemed a package. It is admitted that the quantity of beer annually manufactured and sold in the State is 1,275,000 barrels of thirty-one gallons each, to-wit, 39,525,-000 gallons, and that 165,000 barrels of beer of thirty-one gallons each, to-wit, 5,115,000 gallons are annually imported into the State for sale, and that the average net value of said beer is $5 per barrel. Upon these facts the court declares that the fee of one cent for inspecting and gauging each gallon of said beer and two cents for labeling each package is a tax, and that the same is levied in violation of sections 4 and 8 of article 10 of the Constitution of the State, and that as to such tax the act is void.

"5.   Under the laws of this State the brewer, as a manufacturer, is, and at and before the time at which the Act of May 4, 1899, took effect, was, subject to an ad valorem tax on his raw materials and finished products equal to the tax on real estate. The tax imposed by said Act of May 4, 1899, is in addition to the said manufacturer's license tax, and therefore constitutes a double tax for the same time on the same property, and hence is void, both because it is in excess of the rate allowed for State purposes by section 8 of article 10 of the Constitution and because it is double taxation.

"6.   The tax imposed by said Act of May 4, 1899, is a specific tax, and not a tax in proportion to the value of the property taxed, and hence is void under section 4 of article 10 of the Constitution of this State.

"7.   Said Act of May 4, 1899, provides that all beer manufactured in the State shall be inspected, and that so much of it as is sold in the State is subject to the tax imposed by said act, and so much of it as is exported out of the State for sale is free of said tax. The court declares that the discrimination thus created between the brewer who sells his product in the State and the brewer who exports his product out of the State—

taxing the former and exempting the latter—violates section 3 of article 10 of the Constitution, and as to said tax said act is void.

"8.   By the statutes of this State now in force, and which were in force when said Act of May 4, 1899, was passed and when it went into effect, all merchandise and finished products of manufacturers constituted, for the purpose of state, county, and municipal taxation, a separate and distinct class, all subjects of which must be taxed alike.   The Act of May 4, 1899, singles out beer and imposes upon it an additional tax not imposed upon the merchandise of any merchant, or the raw material or finished product of any manufacturer, in the State, other than brewers, and hence violates section 3 of article 10 of the Constitution, which requires that taxes shall be uniform upon the same class of subjects within the State.

"9.   Under the Constitution of the State, the Legislature has no power to impose upon any one subject of property a burden of taxation not equally imposed on all other subjects of the same class.

"10.   In exempting from taxation the beer manufactured in the State and exported out of it, said Act of May 4, 1899, violates sections 6 and 7 of the Constitution of the State, and is therefore void.

"11.   Inasmuch as said Act of May 4, 1899, imposes a tax on the brewer who sells his product in the State, and exempts from such tax the brewer who exports his product, it denies to the former the equal protection of the laws, in violation of the fourteenth article of amendments to the Constitution of the United States; and hence said Act of May 4, 1899, is void as to said tax.

"12.   Said Act of May 4, 1899, provides that all beer imported into the State shall be inspected in the package in which it is imported, and before it is offered for sale, and shall

be subject to the same tax imposed upon beer manufactured and sold in the State. Such provision violates section 10 of article 1 of the Constitution of the United States, and hence is void."

Which said declarations of law were refused, and defendant excepted.

The court then, over the objection and exception of defendant, declared the law to be as follows: "The court declares the law to be that if the court, sitting as jury, in this cause, finds and believes from the evidence and admitted facts that the defendant on or about the twenty-sixth day of May, 1900, at the county of Henry and State of Missouri, sold a pint of lager beer to H. C. Jones, from a keg of lager beer containing eight gallons, without having on said keg the certificate of the State Beer Inspector, then the court should find the defendant guilty."

In passing upon the questions involved in this appeal, it becomes necessary to first determine the purpose and character of the Act of May 4, 1899; that is, whether it is simply an inspection or revenue measure, or both an inspection and a revenue measure. It will be observed that, while the title of the act speaks only of the "inspection of beer," section 8 of the act provides for an "inspection fee" of one cent per gallon on all beer and malt liquors manufactured or sold in this State, and two cents for labeling each package of eight gallons or less, making a total of one and one-fourth cents per gallon, the proceeds of all which is required to be paid into the State Treasury, and placed to the credit of the general revenue fund of the State. Section 9 provides that all fees received by the inspector under the provisions of the act shall on or before the last day of each month be paid into the State Treasury by the inspector, and shall be placed to the credit of the general revenue fund. Section 7a provides that the State Treasurer shall

cause suitable stamps to be prepared for the enforcement of the act, which are to be delivered from time to time to the inspector, "taking therefor his receipt, and shall charge said inspector with the same; and shall from time to time as said inspector makes returns of moneys collected in the course of his inspection, credit said inspector's account with such sums, and shall keep a true and correct book account of his dealings with said inspector." It was shown upon the trial that this rate of one and one-fourth cents per gallon on the manufacture and sale of beer in this State will yield an annual income of over $558,-000. By the law, what is called the "inspector's fees" do not go to the inspectors, but into the State Treasury. The inspectors are paid salaries aggregating $9,000 per annum, and the other expenses incident to the enforcement of the law, are fixed at $3,000, the total amount being $12,000 per annum, and provided by appropriations out of the general fund, thus adding to the general revenue fund of the State over half a million dollars by the enforcement of this law.

Under this state of facts, can this rate on beer and malt liquors be correctly called an "inspection fee?"

The mere fact that the act is entitled "An Act creating the office of inspector of beer and malt liquors of the State, and providing for the inspection of beer and malt liquors manufactured and sold in this State," does not authorize it; nor does the language of the act itself necessarily do so, for, in whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect. [Henderson v. City of New York, 92 U. S. 259; Minnesota v. Barber, 136 U. S. 313; Prent. Police Powers, p. 31.]

In the case of Minnesota v. Barber, supra, there was involved the validity of a statute of that State, which required the inspection, before slaughtering, of beef cattle, and in course of the opinion it was said: "The motives of the legislators, con-

sidered as the purposes they had in view, will always be presumed to be to acomplish that which follows as the natural and reasonable effect of their enactment. In Mugler v. Kansas, 123 U. S. 623, 661, the court, after observing that every possible presumption is to be indulged in favor of the validity of a statute, said that the judiciary must obey the Constitution, rather than the lawmaking department of the government, and must, upon its own responsibility, determine whether, in any particular case, the limits of the Constitution have been passed." So, in the case of Voight v. Wright, 141 U. S. 62, the court held that "a state can not, under the guise of enacting inspection laws, make discriminations against the products and industries of other States, in favor of its own products and industries."

It will be admitted that the State, in the exercise of its police power, may require the inspection of beer manufactured in this State, before being offered for sale, and allow reasonable fees for the inspection and expenses attending the same; but if such measure be intended as a means of raising general revenue for the State or such is its effect, it can not be sustained, for such fees are permissible, for the purpose only of paying the expense of regulating and controlling the business, and are not taxes. [Cooley, Tax'n (2 Ed.), 603; City Council v. Rogers, 2 McCord, 495; O'Maley v. Borough of Freeport, 96 Pa. 24.]

But if in excess of what may be reasonably necessary for that purpose, and the excess is paid into the treasury for other expenditures, it becomes a tax. [American Fertilizing Co. v. Board of Agriculture of North Carolina (C. C.) 43 Fed. 609; Willis v. Oil Co., 50 Minn. 290.]

Brimmer v. Rebman, 138 U. S. 78, was a prosecution for the violation of an act entitled "An act to prevent the selling of unwholesome meat," which provided that the inspector should receive as his compensation, one cent per pound, to be

paid by the owner of the meats. The court said, "The fees exacted under the Virginia statute for the inspection of beef, veal, and mutton, the product of animals slaughtered one hundred miles or more from the place of sale, are in reality a tax." And later in the opinion, in speaking of the claim that the statute should be treated as a police measure for the prevention of the sale of unwholesome meats, as it was aimed only at meats transported one hundred miles or more from the place where slaughtered, the court ruled that this ought not to control the case, "because the statute, by reason of the onerous nature of the tax imposed in the name of compensation to the inspector, goes far beyond the purposes of legitimate inspection to determine the quality and condition, and, by its necessary operation, obstructs the freedom of commerce among the States." It was held in the case of Patapsco Guano Co. v. Board of Agriculture of North Carolina, 171 U. S. 345, that twenty-five cents per ton on fertilizers was not in excess of what was necessary to pay for the cost of analysis, salaries of inspectors, etc., and therefore valid as inspection fees. The act under consideration in that case imposed a charge of twenty-five cents per ton on commercial fertilizers, and the purpose of the charge was declared to be to defray the expenses of inspection only; and in passing upon that question it was said: "But treating the question whether the charge of twenty-five cents per ton was shown to be so excessive as to demonstrate a purpose other than that which the law declared, as a judicial question, we are satisfied that, comparing the receipts from this charge with the necessary expenses, such as the cost of analysis, the salaries of inspectors, the cost of tags, express charges, miscellaneous expenses of the department in this connection, and so on, we can not conclude that the charge is so seriously in excess of what is necessary for the objects designed to be effected as to justify the imputation of bad faith, and change the character of

the act." It will thus be seen that while it is not expressly decided in that case, it is clearly intimated, that if, in the opinion of the court, the taxes had been seriously in excess of what was necessary for the objects designed to be effected by the act, it would have been held invalid upon that ground.

The act in question, in the case in hand, imposes a charge of one cent per gallon for each gallon contained in each package of beer, and two cents for labeling each package, and by the last section of the act there is appropriated out of the State Treasury, chargeable to the general revenue fund, for the years 1899 and 1900, for the pay of the inspectors, $6,000; for the pay of four deputies, $12,000; for rent, stationery, fuel, printing, and such other things as may be necessary for the transaction of the business of said inspector, the sum of $6,000; while the revenue derived by such inspection amounts per annum to about $558,000. Under these circumstances, no court of justice ought to hesitate to declare, as a judicial question, that the charge is so seriously in excess of what is necessary for inspection, and expenses attending the same, as to demonstrate a purpose other than that which the law declares.

In the case of American Fertilizing Co. v. Board of Agriculture of North Carolina, supra, in speaking of an act of the Legislature providing for a license fee of $500 each per annum for the privilege of selling separate brands of fertilizers, with respect to which it was contended that the law might be upheld as part of the police power of the State, the court observed: "If the legislation in question can properly be referred to that power, it will be because the right to pass inspection laws may be deemed to have its foundation in the police power of the State. Certainly, if it be anything but what the act itself seems to contemplate—a tax on occupation, or a privilege tax—it is because it is used to secure an inspection of commercial fertilizers before they can be sold in North Carolina. Such a tax

would be constitutional only within the limits of the Constitution. It can not be sustained when evidently in excess of what is required for such purpose, and when the proceeds are applied to other uses. We think that in this case the court might judicially take notice of the evident fact that $500 on a brand of commercial fertilizers is a much larger sum than can be necessary for its inspection."

Willis v. Oil Co., supra, was an action by an inspector for fees as such allowed by an act of the Legislature of Minnesota for inspecting mineral illuminating oils, wherein it was contended by defendant that the charges were excessive. The court said: "It is also objected that the act is one levying a tax, and not a police regulation. Of course, under the constitutional provision requiring taxes to be as nearly equal as may be, and to be levied on a cash valuation, the tax would not be sustained as a tax law. It can only be upheld as an exercise of the police power of the State, as intended to be just what it purports to be—an inspection law requiring to be inspected articles which from their nature and use, may be dangerous to the lives or property of the people of the State. The imposition of fees for inspection, if intended as a mode of raising revenue for the State, could not be sustained. It could be upheld only as a mode of making the business of dealing in oils pay the expense of its proper police regulation. That the State may make any business requiring police regulation pay the expense of regulating and controlling it, and that this may be done by exacting fees, license fees, or inspection fees from those engaged in the business, no one disputes. On its face, this law is a bona fide police regulation—a proper inspection law; and the fees are, in good faith, exacted to reimburse the State in the expense of inspection and enforcing observance of the law. Of course, the State or a municipality may attempt to make the right to exact fees a cover for imposing a tax for

general revenue; and, when the court can say that such is the case, the law must stand or fall as a tax law."

The inspection of beer and other malt and distilled liquors can only be required by the State in the exercise of its police powers, for which a reasonable inspection fee may be required to be paid by the person manufacturing it, as a condition precedent to its offer for sale, but its purpose can not be diverted for the purpose of raising money or revenue.    As was said by Mr. Justice FIELD, in his dissenting opinion in the Munn case, 94 U. S. 113: "One may go, in like manner, through the whole round of regulations authorized by legislation, state or municipal, under what is known as the 'police power,' and in no instance will he find the compensation of the owner for the use of his property has any influence in establishing them.    It is only where some right or privilege is conferred by the government or municipality upon the owner, which he can use in connection with his property, or by means of which the use of his property is rendered more valuable to him, or he thereby enjoys an advantage over others, that the compensation to be received by him becomes a legitimate matter of regulation.    Submission to the regulation of compensation in such cases is an implied condition of the grant, and the State, in exercising its power or prescribing the compensation, only determines the conditions upon which its concession will be enjoyed.    When the privilege ends, the power of regulation ceases."    [State v. Associated Press, 159 Mo. 410.]

Revenue is never    the object    to    be    attained    by inspection laws, nor to restrict the sale of the commodity inspected, but they are for the protection of the people from fraud and imposition in certain articles in use, and to promote health and advance morals; and the character of the article inspected—whether its use as a beverage or otherwise be demoralizing or not—is of no significance, in so far as

the fee to be charged therefor is concerned; for, whatever may be its character, nothing more than a reasonable fee for the labor and cost attending the inspection has ever been, or can be, allowed therefor.    And, in so far as I am concerned, I have been unable to find an authority to the contrary.    Nor do I believe that one can be found.

But it is said that the right to manufacture and sell beer and malt liquors is not a natural right, and therefore the State may place such restrictions about it as it may see fit; but the right to do these things, and to sell in original packages, has never been prohibited by the laws of this State, which only required of the manufacturer, prior to the passage of the act in question, in order that he might do so, an occupation tax. The brewer is also required to pay an advalorem tax upon the greatest amount of raw material and finished product which he may have on hand between the first Monday in March and the first Monday in June in each year, but this is not a condition precedent to his right to manufacture and sell.    But by the act in question he ·is required not only to pay· an occupation tax before he can sell his product, which he has been authorized by law to manufacture, but to have it inspected, and to pay enormous and unreasonable charges therefor, under the cover of inspection fees, which said act, when stripped of its mask, is nothing more nor less than a revenue measure. A non-resident corporation engaged, for instance, in the manufacture of fertilizers, does not possess the absolute right to sell its product by retail in this State, and it is only by grace that it may be permitted to do so, and, like the manufacture and sale of beer and malt liquors, can only do so by compliance with our laws; yet no one will contend that if by the laws of this State an inspection should be required of any such article brought here by such corporation before being offered for sale, and an inspection fee were allowed by law for that purpose, it could be sustained,

when evidently in excess of what would be required for such purpose, and especially when the proceeds are applied, as in this case, to another purpose. [American Fertilizing Co. v. Board of Agriculture of North Carolina, supra.] There is no difference in principle between the two cases. That the State may, in the exercise of its sovereign power, regulate the sale of beer and malt liquors, and impose fees for their inspection, for the purpose of paying the expenses of regulating and controlling the business, or prohibit their sale or manufacture altogether, is not questioned, provided, always, that such fees, when exacted, be reasonable, and the right to exact them is not made a cover for imposing a tax for general revenue. While what is a reasonable fee for inspection must, of necessity, depend largely upon the exercise of a sound discretion by the Legislature, having reference to the time occupied, the place, and services to be performed in making the inspection, and, unless, under the circumstances, it be clearly unreasonable, it will not be adjudged a tax, yet if it is manifestly in excess of what is required for such purpose, and the proceeds are applied to other uses, courts will not hesitate to declare it a tax. There is a limit, however, beyond which even the Legislature, in the exercise of its discretion in enacting laws for inspection fees, may not go, and that is that they shall not be exorbitant, or more than is reasonably necessary to pay for the inspection, and expenses attending the same; and no judge or text-writer has ever written anything to the contrary. Moreover, there is not to be found an authority which announces a different rule for inspection fees for inspecting beer and malt liquors, and for inspecting any other article or commodity. In all cases the fee must not be in excess of a reasonable amount necessary for the purpose. If the brewer's property can be excessively taxed for revenue under the guise of inspection fees to such an extent as in this case, then there is no reason why

fifty or one hundred per cent upon his output may not be taken for the same purpose; and this would be legislative discretion run mad.

The case of State v. Ludington, 33 Wis. 107, is mainly relied upon in the opinion of the court as announcing a different rule; that is, that the Legislature may allow any amount that they may think proper for inspection fees for inspecting beer and malt liquors, and that courts can not declare such legislation invalid, however much in excess of a reasonable amount for such purposes the fee may be. But that was an application for mandamus against Ludington, mayor, and Mahoney and White, as clerk and comptroller, of the city of Milwaukee, respectively, commanding them not to sign or issue a license to any person to sell spirituous or intoxicating liquors in said city without requiring a bond in each case to be given; and no question of inspection or of inspection fees was involved or in any manner alluded to or discussed in it, and it is not an authority upon that question. Now, when it is considered that the inspection fee of one and one-fourth cents per gallon upon the manufacture and sale of beer in this State will yield an annual income of over $550,000, which is paid into the State Treasury, while the salaries of the inspectors, with other expenses incident to the enforcement of the law, do not exceed $12,000 per annum, it needs no argument to satisfy the unbiased mind that the fee is manifestly unreasonable and unconscionable; and it can only be upheld, if at all, upon the ground that it is a revenue measure. That such was the purpose of the act is manifest from the fact that when the bill was first introduced in the senate its title was "An act creating the office of inspector of beer and malt liquors, and providing for an increase in the general revenue of the state," and that the title was afterwards amended, and that part of it which referred to the increase of revenue stricken out, and by the further fact that, in the discussion of

the bill in the senate, it was always referred to and discussed as a revenue measure, and that, when the fees are collected and paid into the State Treasury, they become a part of the revenues of the State. That the operation of the act was as a revenue measure, notwithstanding its inspection features, we think clear; and as SHERWOOD, J., said in State v. Seibert, 123 Mo. 433: "Courts of justice are not to be imposed on by diaphanous disguises which change the verbiage of the statute, but leave the effect the same. When the act questioned is clearly evasive of constitutional prohibitions, the court will not fail to notice the evasion, nor to apply the remedy."

It follows that the act can not be sustained as an inspection measure, because the fees derived therefrom will amount per annum to $538,000 more than, or forty-five times as much as, will be necessary for that purpose, and because it is manifest from the act that its purpose was and its effect is that of a revenue measure, under the guise of an inspection measure.

If, then, the act can not be sustained as an inspection measure, because the inspection fee fixed by it is unreasonable, and is a revenue measure under the cover of an inspection measure, is it invalid upon the ground that it imposes a tax upon property? If, as we have said, the tax can not be sustained as an inspection measure, it must follow that it is a tax upon property, or no tax at all. And if a tax upon property, as it clearly is, it is in conflict with section 8, article 10, of the Constitution of this State, which provides that "the State tax on property, exclusive of the tax necessary to pay the bonded debt of the State, shall not exceed twenty cents on the hundred dollar valuation; and whenever the taxable property of the State shall amount to nine hundred million dollars, the rate shall not exceed fifteen cents." This tax is required to be paid into the State Treasury, and to be placed to the credit of the general revenue fund of the State. It does not go into

the sinking fund, as it is not levied to pay State indebtedness. A direct tax of ten cents on the one hundred dollars valuation is levied for that purpose. It is a matter of general information that in 1892 the $900,000,000 limit referred to in the section of the Constitution quoted was reached, and that by reason thereof the Legislature on March 24 of that year passed an act providing that there should be assessed and collected, as the assessed value of all the real estate and personal property subject to taxation in this State, fifteen cents on each one hundred dollar valuation of State revenue, and ten cents on the one hundred dollars for the payment of all State indebtedness. [Acts 1892, p. 16.] Manufacturers of beer and malt liquors now pay the full rate of taxes authorized by law. Brewers pay State taxes as manufacturers on the greatest aggregate amount of raw material and finished product which they may have on hand between the first Monday in March and the first Monday in June, as provided by section 8486, Revised Statutes 1899. That this is a tax upon property, and not an occupation tax, is indisputable. [Kansas City v. Johnson, 78 Mo. 661; State v. Tracy, 94 Mo. 217.] In addition to these taxes which the brewer or manufacturer of malt liquors is required to pay, the Act of May 4, 1899, proposes to levy an additional tax upon this particular species of property greatly in excess of the maximum rate fixed by the Constitution. According to the evidence, the market value of beer is $5 per barrel, and a barrel contains thirty-one gallons, which is sixteen and two-fifths cents per gallon. As said by counsel for defendant in their brief: "The law in question, therefore, proposes to impose a tax of one cent on property worth sixteen and two-fifth cents, which amounts to a fraction over six per cent ad valorem, while the maximum rate fixed by the Constitution (fifteen cents on the hundred

dollars) is less than one-sixth of one per cent; that is to say, a tax of one cent per gallon amounts to more than forty times as much as the maximum rate fixed by the Constitution. But this is not all. The Act of May 4 also imposes a package tax of eight cents on each barrel of beer so that the total tax on a barrel of beer worth five dollars is thirty-nine cents. Twenty barrels represent a value of $100, on which the tax would be $7.80, so that the proposed tax would be $7.80 on the hundred dollars, while the constitutional limit is fifteen cents on the hundred dollars—more than fifty times as much.

In the case of City of Brookfield v. Tooey, 141 Mo. 619, it was held that an ordinance which assessed a "license tax of one per cent per annum upon the goods, wares, and merchandise of said city" does not create an occupation tax or license, but a plain property or ad valorem tax, and, being in excess of the maximum limit permitted by the Constitution, is void; that such tax is also void because it is not uniform as to all personal property within the city.

In State v. Stephens, 146 Mo. 662, the tax in litigation was upon the mileage value of certain railway cars, other than those owned by railroad companies in this State, but owned by other parties. The tax was assessed at $2 on the one hundred dollar valuation. The contention by the State was that it was not a tax upon property, but, rather, a license or excise tax upon the business of the owners of the cars done in Missouri. The court ruled that it was a tax upon property, and, being in excess of the constitutional limit of twenty cents upon the one hundred dollars, was void. It would seem to follow that the tax, being a property tax, and largely in excess of the fifteen cents on the one hundred dollars allowed by the Constitution, is absolutely void.

The position is also taken in the opinion that the act may be sustained upon the ground that the inspection fee allowed by

State v. Bixman.

it is a license tax, and that the fee authorized is the price which the State demands for the privilege of brewing and selling malt liquors in this State, and, being such, it is immaterial by what it is called, as it is not a tax upon property, within the meaning of our Constitution. We must admit that this idea is well expressed, for, if it is not a revenue measure, it would be a difficult task to correctly name the act; but it is not on account of that fact that faith must be imposed in it, but because of the fact that it is a revenue producer to the State. Granting, however, that the payment of the inspection fee and compliance with the provisions of the act amount, in substance, to a license, and confer upon persons who comply with its provisions the right to manufacture and sell beer and malt liquors (Galloway v. Stewart, 49 Ind. 156), even from that point of view it is not a valid law. The title of the act is "An Act creating the office of inspector of beer and malt liquors of the State, and providing for the inspection of beer and malt liquors manufactured and sold in this State," and there is not a word said in it about a license tax or any other tax, nor about the inspection of beer or malt liquors manufactured out of this State and shipped into it for sale, nor about beer and malt liquors manufactured in this State and shipped out of it; yet an inspection fee is required in the case of beer and malt liquors manufactured out of and shipped into this State for sale. Inspection is "the examination of certain articles made by law subject to such examination, so that they may be declared fit for commerce." [Bouv. Dict. tit. "Inspection"; Neilson v. Garza, 2 Woods, 287.] A license tax of one cent on the gallon for the sale of beer or malt liquors is in effect a tax upon the beer and malt liquors themselves (Welton v. Missouri, 91 U. S. 275), and being "a plain property or ad valorem tax, and being in excess of the maximum limit permitted by the Constitution, is void." [City of Brookfield v. Tooey, supra.] But this is not

all. The title of the act does not meet the requirements of section 28, article 4, of the Constitution of this State, which provides that no bill except appropriation bills, shall contain more than one subject, which shall be clearly expressed in its title. The act is, as we have said, clearly a revenue measure; but if both an inspection and license tax or revenue measure, and they could have both been united in the same act, they certainly should have been embraced in the title. Judge COOLEY, in his work on Constitutional Limitations, says: "If the subject is composed of two or more essential elements, the expression of one of such elements in the title would not suffice. The absence of one of such elements in the title would be as misleading and might be as pernicious as the evils sought to be obstructed by the Constitution." [Henderson v. Insurance Co., 135 Ind. 23, 31.] "The principal questions in each case will therefore be whether the act is in truth broader than the title, and, if so, then whether the other objects in the act are so intimately connected with the one indicated by the title that the portion of the act relating to them can not be rejected, and leave a complete and sensible enactment which is capable of being executed." [Cooley, Const. Lim. (3d Ed.), pp. *148, *149.]

The title to the act should be so clear "that neither the members of the Legislature nor the people should be misled by the title." [Sun Mut. Ins. Co. v. Mayor, etc., of City of New York, 8 N. Y. 253.]

No one can read the title of this act, and shut his eyes to that which is apparent upon the face of it (that is, that it only applies to the inspection of beer and malt liquors which are manufactured and sold in this State, for which, it is conceded, a reasonable inspection fee may be allowed); but the right to levy an inspection fee upon beer and malt liquors manufactured out of this State and sold within it, or to levy an inspection tax upon all beer manufactured and offered for sale in this

State, is not covered by the title, but by implication is excluded therefrom.   As was said in Kansas City v. Payne, 71 Mo. 162: "The body of the bill expresses its object.   The title of the bill disguises and conceals it."   No one would suppose, from reading the title to the act, that it was to apply to beer and malt liquors manufactured out of, and offered for sale in this State, or that a license tax was authorized to be levied thereby.   In the language of Judge COOLEY:   "The Constitution has made the title the exclusive index to the legislative intent."   [Kansas City v. Payne, supra; State v. County Court of Jackson Co., 102 Mo. 531; State v. Schofield, 41 Mo. 39; State v. County Court of Marion Co., 128 Mo. 427; Witzmann v. Railway Co., 131 Mo. 612; State v. Persinger, 76 Mo. 346.]

So, in the case of Town of Cantril v. Sainer, 59 Iowa, 26, it was held that, an ordinance being entitled "Regulating the use and sale of intoxicating liquors," but the substance of the ordinance, as found in the body of it, being entirely prohibitory, with no pretense of regulation, it was invalid for want of compliance with the law requiring the subject of an ordinance to be clearly expressed in its title.   The primary and sole object which is clearly indicated by the title of the act is to prohibit the sale of beer and malt liquors manufactured in this State, before being inspected, for which an inspection fee might, of course, be authorized by the act to be taxed, and this is all that is included in its title; and all else in the act, including the right to collect a license tax, is in violation of the Constitution and void.   [Stebbins v. Mayer, 38 Kan. 573.]

The point is made that the act discriminates between manufacturers of malt liquors who sell their product within this State, and those who sell to purchasers living out of the State, and is therefore in conflict with section 3, article 10, of the Constitution of this State, which provides that taxes "shall be uniform upon the same class of subjects within the territorial

limits of the authority levying the tax." While both are subject to taxation by the State (Coe v. Town of Errol, 116 U. S. 517), the brewer who sells his product in this State is compelled to pay an inspection fee thereon before offering the same for sale, while another brewer, engaged in the same business in this State, and who exports his beer out of the State, is entitled by the act to have his beer inspected free of cost, thus discriminating in favor of the latter against the former. In City of St. Louis v. Spiegel, 75 Mo. 145, it was held that a license fee imposed upon the keepers of meat shops is a tax, and must be uniform within the territorial limits of the authority enforcing it, and that a city ordinance which requires a license fee of one amount in one part of a city and a different amount in another is void. [City of St. Louis v. Spiegel, 90 Mo. 587.] In City of Brookfield v. Tooey, supra, which involved the validity of a tax of one per cent upon the goods of a merchant, GANTT, P. J., in speaking for the court, said: "We are firmly convinced that this tax can not be held to be other than a direct tax upon property. It is therefore in direct disobedience of sections 3 and 11 of article 10 of the Constitution of Missouri, because it is not uniform upon all the personal property in said city, but levies $1 upon every $100 of assessable personal property belonging to a merchant, and exempts all personal property not belonging to a merchant from said tax." [See, also, City of Chicago v. Collins, 175 Ill. 445; City of Cullman v. Arndt (Ala.), 28 South. 70; State v. Switzler, 143 Mo., loc. cit. 333, 45 S. W. 245; Ex parte Jones (Tex. Cr. App.), 43 S. W. 513; Pullman Palace Car Co. v. State, 64 Tex. 274; City of Williamsport v. Stearns, 2 Pa. Dist. R. 351; City of Savannah v. Weed, 84 Ga. 683; Kansas City v. Grush (Mo. Sup.), 52 S. W. 286; State v. Tucker (S. C.), 35 S. E. 215; State v. Hoyt (Vt.), 42 Atl. 973; Amoskeag Mfg. Co. v. City of Manchester (N. H.), 47 Atl. 74.] More-

over, the tax is not uniform, in this:  it imposes the same tax per gallon on all grades of beer, irrespective of its value, thus discriminating in favor of the manufacturer of beer and malt liquors of a high grade and of greater value, against the manufacturers of beer and malt liquors of less value per gallon.

The act is void, for the further reason that it is violative of that provision of article 14 of the amendments to the Constitution of the United States which provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws," in that it discriminates against the brewer who sells his beer in this State, by requiring him to have it inspected and to pay an inspection fee therefor before offering it for sale, while his neighbor, engaged in the same business, and who ships and sells his brew beyond this State, is required to have his beer inspected before doing so, but gets his inspection free of any inspection fees, thus denying them equal protection of the law.

The act is void for want of proper provisions to carry it into practical effect.  By the seventh section of the act it is made the duty of the inspector to cause to be inspected all beer or other malt liquors brewed or manufactured or sold in this State, and to place upon the package containing such beer his label, certifying that the same has been inspected, etc. And by section 8 it is provided that the inspector shall be entitled to receive for inspecting and gauging one cent for each gallon contained in each package, and two cents for labeling each package.  It conclusively appears from the evidence that one inspector and four deputies can not possibly inspect all the beer brewed and sold in all the breweries of this State without subjecting the business to delays to such an extent as to

practically destroy the same, and that an attempt to inspect or analyze the beer after it has passed into packages for consumption involves a spoliation of every package thus inspected. "In the Beer Brewer, of A. F. Zimmermann, teacher of theoretical and practical brewing, who has devoted thirty-five years to this business, it is stated that a ripened tun of lager or store beer must be racked off all at once, for when it is left half full it becomes flat, and that the tun of pot lager beer must, if possible, be all drunk off in the same day it is tapped, because on the following day the beer gets an unpleasant taste, even when the bung has not been taken out, but only a small hole has been made, which is opened only at the time of drawing the beer, and is immediately closed again with a spigot." [I Ures, Dict. 160.] But there is not a word said in the act about taking a sample of the mash or of the beer while fermenting, and the only method indicated by said section of the act is inspection by the "package," as the words, "it shall be the duty of such inspector to cause to be inspected all beer or other malt liquors, and to place upon the 'package' containing such beer or malt liquor his label, certifying that the same has been inspected," etc., clearly mean. By section 8 it is provided that the "inspector shall be entitled to receive for inspecting and gauging one cent for each gallon contained in each package..... The word 'package,' as used in this act, shall be construed to mean any vessel of any kind other than pint and quart bottles in which any beer or malt liquor may be placed for sale, containing eight gallons or less; when said beer or malt liquors are placed in pint or quart bottles, a 'package,' as used in this act, shall be construed to mean not to exceed forty-eight pint bottles or twenty-four quart bottles of beer or malt liquors, which when manufactured and so bottled must, before sale, be placed in suitable cases containing said number and size of bottles, for inspection and stamping

by said state inspector." .... Moreover: "Any provision in a statute which declares its meaning or purpose is authoritative. Whether it relates to the object of a whole act, or of a single section or of a word, it is a declaration having the force of law. It is binding on the courts, though otherwise they would have understood the language to mean something different. .... It has been said that an interpretation clause should be used for the purpose of interpreting words which are ambiguous or equivocal, not so as to disturb the meaning of such as are plain. It is often inserted for this purpose, or for abundant caution, that there may be no misapprehension, though the interpretation so directed is not different from that which the language used would otherwise receive. In such case this provision leads to no difficulties of construction." [Suth. St. Const., sec. 402.] But it is said that the seventh section of the act, standing alone, does not require the inspector, in making his inspection, to defer it until after the beer is sealed in the barrels or bottles. This position is, however, clearly untenable, for by the very words of that section the inspector is required "to place upon the package containing such beer or malt liquors his label certifying that the same has been inspected and made from wholesome ingredients," and it has no reference whatever to an inspection in any other way than in the package. Besides, the eighth section of the act defines what a package is, which is not in accord with the views expressed in the opinion. A still more fallacious position is "that, by reading the whole act together, the inspector is not restricted to an examination or analysis of the finished product after it is bottled or barreled, but he is authorized to go directly to the brewery and take a sample of the mash and of the beer in the vat in the process of fermentation; that this method is the one which the state inspector has approved." This same inspector was a witness in behalf of the State upon

the trial of this cause, and testified that he was not a practical brewer, and never brewed a drop of beer in his life. Besides, the question is one of construction of an act of the Legislature, and therefore a judicial one; but, even if one with respect to which an expert could properly testify, he was wholly incompetent for that purpose. It was a matter about which every member of this court knows as much as the inspector does, and it matters not how little that may be. However, his opinion is in direct conflict with the express provisions of the act. And how the opinion of the highest judicial tribunal of this State could be predicated on such an opinion can only be justified upon the ground, if at all, of the seeming dire necessity of some kind of authority to support it, whether it does so or not.

Paraphrasing what was said by SHERWOOD, J., in his dissenting opinion in Kansas City v. Bacon, 147 Mo., loc. cit. 303. And in this case the act, by pointing out the way in which beer and malt liquors shall be inspected, and in designating the fee to be charged therefor as an "inspection fee," necessarily excludes any other method, fee, or tax. "Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of such a provision." [People v. Draper, 15 N. Y. 544; Bank v. Graham, 147 Mo. 250.]

In Willis v. Oil Co., supra, one of the questions passed upon was whether storage tanks for illuminating oil came within the meaning of the term "package," and the court said: "It would be a strange use of the term 'package' to apply it to such a receptacle, into which the oil is poured, not for the purpose of handling, transportation, or sale, but only for keeping. We might as soon expect to hear it applied to a grain elevator or a storage coal bin." So it seems to me that by no fair process of reasoning can the act, which provides for but

one way of inspecting beer (that is, while in the "package"), be construed as authorizing an inspection of the mash, or of the beer while fermenting or while in the vats. In the case of State v. West Side St. Ry. Co., 146 Mo. 155, an act not nearly so imperfect as the one under consideration was held to be invalid for uncertainty, and that courts can not supply or remedy a legislative act. But in this case some of the defects in the act are supplied by the court. For these considerations, we are of the opinion that the act is void, and that the judgment should be reversed, and the defendant discharged.

*Sherwood* and *Robinson, JJ.*, concur.